DA 09-0322

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2010 MT 155

PLAINS GRAINS LIMITED PARTNERSHIP, a Montana limited partnership; PLAINS GRAINS, INC., a Montana corporation; ROBERT E. LASSILA and EARLYNE A. LASSILA; KEVIN D. LASSILA and STEFFANI J. LASSILA; KERRY ANN (LASSILA) FRASER; DARYL E. LASSILA and LINDA K. LASSILA; DOROTHY LASSILA; DAN LASSILA; NANCY LASSILA BIRTWISLE; CHRISTOPHER LASSILA; JOSEPH W. KANTOLA and MYRNA R. KANTOLA; KENT HOLTZ; HOLTZ FARMS, INC., a Montana corporation; MEADOWLARK FARMS, a Montana Partnership; JON C. KANTOROWICZ and CHARLOTTE KANTOROWICZ; JAMES FELDMAN and COURTNEY FELDMAN; DAVID P. ROEHM and CLAIRE M. ROEHM; DENNIS N. WARD and LaLONNIE WARD; JANNY KINION-MAY; C LAZY J RANCH; CHARLES BUMGARNER and KARLA BUMGARNER; CARL W. MEHMKE and MARTHA MEHMKE; WALTER MEHMKE and ROBIN MEHMKE; LOUISIANA LAND & LIVESTOCK, LLC, a limited liability corporation; GWIN FAMILY TRUST, U/A DATED SEPTEMBER 20, 1991; FORDER LAND & CATTLE CO.; WAYNE W. FORDER and DOROTHY FORDER; CONN FORDER and JEANINE FORDER; ROBERT E. VIHINEN and PENNIE VIHINEN; VIOLET VIHINEN; ROBERT E. VIHINEN, TRUSTEE OF ELMER VIHINEN TRUST; JAYBE D. FLOYD and MICHAEL E. LUCKETT, TRUSTEES OF THE JAYBE D. FLOYD LIVING TRUST; ROBERT M. COLEMAN and HELEN A. COLEMAN; GARY OWEN and KAY OWEN; RICHARD W. DOHRMAN and ADELE B. DOHRMAN, CHARLES CHRISTENSEN and YULIYA CHRISTENSEN; WALKER S. SMITH, JR. and TAMMIE LYNNE SMITH; JEROME R. THILL; and MONTANA ENVIRONMENTAL INFORMATION CENTER, a Montana nonprofit public benefit corporation,

        Plaintiffs and Appellants,

    v.

BOARD OF COUNTY COMMISSIONERS OF CASCADE COUNTY, the governing body of the County of Cascade, acting by and through Peggy S. Beltrone, Lance Olson and Joe Briggs,

        Defendants and Appellees,

SOUTHERN MONTANA ELECTRIC GENERATION and TRANSMISSION COOPERATIVE, INC.; the ESTATE

OF DUANE L. URQUHART; MARY URQUHART; SCOTT
URQUHART; and LINDA URQUHART,

Intervenors, Appellees and Cross-Appellants.

_____

APPEAL FROM:    District Court of the Eighth Judicial District,
                In and For the County of Cascade, Cause No. BDV 08-480
                Honorable E. Wayne Phillips, Presiding Judge


COUNSEL OF RECORD:

    For Appellants:

        Roger M. Sullivan (argued) and John F. Lacey, McGarvey, Heberling,
        Sullivan & McGarvey, Kalispell, Montana
        Elizabeth Best, Best Law Offices, Great Falls, Montana

    For Appellees:

        Alan F. McCormick (argued), Garlington, Lohn & Robinson, Missoula,
        Montana
        Brian J. Hopkins, Cascade County Attorney, Great Falls, Montana
        (Board of County Commissioners)

        Gary M. Zadick (argued) and Mary K. Jaraczeski, Ugrin, Alexander,
        Zadick & Higgins, Great Falls, Montana
        (Southern Montana Electric, Estate of Duane Urquhart, Mary Urquhart,
        Scott Urquhart, Linda Urquhart)

                                        _____

                                        Argued:    November 18, 2009
                                        Submitted: January 27, 2010
                                        Decided:   July 16, 2010


Filed:

                        _____
                                        Clerk

2

Justice Brian Morris delivered the Opinion of the Court.

¶1 Plains Grains Limited Partnership (Plains Grains) appeals from an order of the Eighth Judicial District Court, Cascade County, granting summary judgment to the Board of Commissioners of Cascade County (County) and Southern Montana Electric (SME) and denying Plains Grains' spot zoning claim. We reverse.

¶2 We review the following issues on appeal:

¶3 *Did Cascade County's adoption of a new county-wide zoning regulation in 2009 render moot Plains Grains' spot zoning claim?*

¶4 *Did Plains Grains' failure to seek a stay or injunction to prevent the sale or development of the land render moot its spot zoning claim?*

¶5 *Did the rezoning of 668 acres of land from Agricultural to Heavy Industrial constitute impermissible spot zoning?*

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The initial rezone

¶6 Duane and Mary E. Urquhart and Scott and Linda Urquhart (Urquharts) sought a zone change from Agricultural (A-2) to Heavy Industrial (I-2) for 668 acres of land in the northeast portion of Cascade County. The Urquharts submitted their rezoning application on October 30, 2007, to allow for the construction and operation of SME's proposed coal-fired power plant, known as the Highwood Generating Station (HGS). SME changed its proposal for the HGS to a natural gas fired plant following the Department of Environmental Quality's revocation of SME's air quality permit. The Urquharts and SME participated

3

jointly in the preparation of the application for rezoning. The Urquharts had agreed to sell the property to SME before the County approved the rezone.

¶7 The Urquharts' rezone application claimed that "the requested zoning to heavy industrial use is a prerequisite to the planned construction and operation of an electric generating station." The Cascade County Planning Department adopted and made public its initial Staff Report on November 19, 2007 (Staff Report). The Staff Report described the surrounding land uses as agricultural for more than twenty acres in every direction. Approximately 200 acres of the land fell within the boundaries of the Lewis and Clark Great Falls Portage National Historic Landmark. The Staff Report cited the Urquharts' attempt to "take advantage of the Tax Increment Financing mechanisms provided in state statutes" as the primary reason that the Urquharts had requested rezoning.

¶8 The Staff Report acknowledged that the construction and operation of the HGS would be "out of character with the existing agricultural land uses in the vicinity of the proposed rezoning." The Staff Report noted, however, that construction and operation of the HGS would not necessarily be "out of character with the land uses *allowed* under the existing A-2 zoning district." (Emphasis added). The Staff Report based this conclusion on the fact that the A-2 zone permitted electrical generation facilities through the special use permit process. As a result, the Staff Report determined that "the rezoning is not necessary to accommodate the HGS facility, as such a use is permissible with a special use permit." The Staff Report further noted that the actual construction of any structures or development of the property would require a zoning location-conformance permit.

4

¶9 SME submitted a letter on January 9, 2008, in response to the Staff Report and the Planning Board's report to the Commissioners. SME's letter contained eleven proposed "conditions" that were intended to address the Planning Board's comments. The SME letter contained, in pertinent part, an agreement by SME that "as a condition of rezoning to heavy industrial use, such use shall be solely for purposes of an electrical power plant."

¶10 Plains Grains claims to have been unaware of the SME letter until the Commission's public hearing on the proposed rezone on January 15, 2008. SME submitted an array of documentation at the public hearing, including a traffic impact study, a baseline noise study, a report on the health impacts of coal-fired power plants, a property appraisal report, and a landscape plan. The County adopted a resolution of intent on January 31, 2008, to rezone the Urquharts' property.

¶11 The resolution of intent incorporated by reference the eleven conditions offered in SME's letter. The County published notice of the resolution on four dates over the course of two weeks in February of 2008. The Commissioners met on March 11, 2008, to consider Final Resolution 08-22 to rezone the Urquharts' property from A-2 to I-2. The Commissioners adopted the Planning Board's report as their findings on the proposed rezone. More than 1900 citizens submitted comments on the proposed rezone. The Commission approved the motion to rezone.

## II. District Court Proceedings

¶12 Plains Grains filed a complaint on April 10, 2008. Plains Grains requested that the

court set aside the County's approval of the rezone and requested that the court issue a writ of mandate, a writ of review before this Court, and a declaratory judgment. Plains Grains claimed first that the adoption of the zone change constituted "conditional zoning" and violated the Zoning Enabling Act and statutory and constitutional public notice and participation requirements. Plains Grains also alleged that the zone change constituted impermissible spot zoning. SME and the Urquharts intervened on May 1, 2008. The County and SME responded to Plains Grains complaint with motions for summary judgment that the sale of the property by the Urquharts to SME on August 25, 2008, had rendered moot both issues. The County filed a separate motion for summary judgment on September 20, 2008. Both parties engaged in extensive pretrial litigation.

¶13 The District Court issued its order on November 28, 2008. The court first addressed the County's motion for summary judgment as to mootness. The court rejected the County's argument that a favorable decision could not return Plains Grains to the status quo. The court recognized that "the underlying status quo is not property ownership but the re-zoning determination by the Cascade County Commissioners. That is not moot for either Defendant SME or any of the Plaintiffs." The District Court also rejected the County's argument that Plains Grains should have obtained a stay in order to preserve its claim.

¶14 The District Court denied Plains Grains' motion for summary judgment and its application for writs of mandate and review. The court found first that the eleven allegedly improper conditions constituted merely an adoption of the Planning Board's suggestions and findings. The court rejected Plains Grains' public participation claims after it determined that the County had satisfied the notice and public participation requirements of both the

6

Montana constitution and statutory provisions. Finally, the District Court denied Plains Grains' spot zoning claim on the basis that the rezone did not satisfy the three-part test for impermissible spot zoning articulated by this Court in *Little v. Board of County Comm'rs*, 193 Mont. 334, 346, 631 P.2d 1282, 1289 (1981).

¶15 SME and the Urquharts filed a motion for entry of judgment on January 7, 2009. Plains Grains opposed the motion on the grounds that the District Court's rejection of Plains Grains' motion for summary judgment did not represent a final resolution on the merits. Plains Grains filed a petition for a writ of supervisory control with this Court shortly thereafter. SME opposed the exercise of supervisory control in light of the District Court's denial of Plains Grains' requested relief.

¶16 This Court granted limited supervisory control on April 29, 2009. We directed the District Court to resolve any remaining claims and to issue a final judgment from which Plains Grains could appeal. Our Order delineated the procedure for requesting a stay or injunction pending appeal should Plains Grains choose to exercise that option. The Order did not affirmatively instruct Plains Grains to file a stay or injunction pending appeal.

¶17 The District Court issued its final order and judgment on May 27, 2009. The court denied summary judgment to Plains Grains on all claims and granted the County summary judgment on the merits. Plains Grains filed its notice of appeal with this Court on June 1, 2009. Plains Grains raised on appeal its conditional zoning, spot zoning, and public participation claims. The County filed its cross-appeal on June 11, 2009. The County and SME claimed, as they did in the District Court, that the transfer of the property from the Urquharts to SME had rendered moot Plains Grains' claims.

### III. The 2009 zoning ordinance

¶18    On August 25, 2009, while this case was pending on appeal, the Cascade County Commission voted to approve amendments to Sections 1 through 5 and 7 through 16 of the Cascade County Zoning Regulations (CCZR) and zoning map.  The Planning Board cited the need to update the regulations and definitions and to alter certain zoning districts and boundaries. The 2009 amendments reflected the County's desire to update zoning definitions and to clarify regulations dealing with "hoofed animals" on residential lots and setbacks for wind turbines, among other matters.  The amendments did not change or modify the I-2 Heavy Industrial designation created by the 2008 rezoning of the SME property.  The amendments likewise did not change the zoning of any of the surrounding land.  The SME property retains its I-2 designation (Heavy Industrial) implemented by the 2008 rezone at issue here.  The surrounding land continues to be zoned Agricultural.

¶19    The County inexplicably waited until six days before the scheduled oral argument to file a notice of supplemental authority with this Court.  The County represented that the 2009 version of the CCZR had replaced the zoning regulations in effect at the time of the District Court's November 28, 2008, order.  The County claimed at oral argument that the new version of the CCZR superseded the version in place at the time of the 2008 contested rezone.  The County argued that these amendments ratified the 2008 rezone and therefore mooted Plains Grains' challenges to the 2008 rezone.  This Court ordered supplemental briefs from both parties as to what effect the County's adoption of the 2009 CCZR amendments had on Plains Grains' claims.

¶20 SME separately filed a motion to dismiss on grounds of mootness on August 25, 2009. SME claimed that it had invested "millions of dollars in site work, development of water sources, purchasing and securing space on the transmission network and commencing construction of certain concrete and steel foundation structures" after its purchase of the property. SME claimed that, having undertaken these activities, it could no longer be restored to its original position. SME filed a second motion to dismiss on grounds of mootness on April 9, 2010. SME based this second motion to dismiss on Plains Grains' failure to appeal the August 2009 amendments to the CCZR by the March 1, 2010, deadline. SME argued that the August 2009 amendments had rendered moot Plains Grains spot zoning claim. We address each of SME's motions in due course.

## STANDARD OF REVIEW

¶21 We review *de novo* a district court's grant or denial of a motion for summary judgment. *State v. Butte-Silver Bow County*, 2009 MT 414, ¶ 17, 353 Mont. 497, 220 P.3d 1115. A district court's grant or denial of a writ of mandate constitutes a conclusion of law. We review for correctness a district court's conclusions of law. *Belgrade Educ. Ass'n v. Belgrade Sch. Dist. No. 44*, 2004 MT 318, ¶ 6, 324 Mont. 50, 102 P.3d 517. Zoning designations are legislative acts that courts review for an abuse of discretion. *North 93 Neighbors Inc. v. Bd. of Co. Comm'rs*, 2006 MT 132, ¶ 18, 332 Mont. 327, 137 P.3d 557.

## DISCUSSION

¶22 *Did Cascade County's adoption of a new county-wide zoning regulation in 2009 render moot Plains Grains' spot zoning claim?*

¶23   The County and SME argue that the 2009 amendments to the CCZR render moot Plains Grains' challenges to the 2008 rezone of the SME property. A matter becomes moot when the legal issue presented to a court ceases to exist. *Lohmeier v. State*, 2008 MT 307, ¶ 13, 346 Mont. 23, 192 P.3d 1137. The County relies primarily on our decision in *Country Highlands Homeowners Ass'n v. Bd. of County Comm'rs*, 2008 MT 286, 345 Mont. 379, 191 P.3d 424, for the proposition that the 2009 amendments to the CCZR render moot the 2008 zone change. We examine the circumstances of *Country Highlands* to test this theory.

¶24   The landowner in *Country Highlands* initially had sought a zone change from agricultural to suburban-agricultural. The board of county commissioners approved the zone change (2003 rezone). *Id.* at ¶ 9. An association of neighboring landowners challenged the county's approval of the 2003 rezone. *Id.* at ¶ 12. The landowner acquired another plot of land contiguous to the original acreage after the county had approved the 2003 rezone.

¶25   The landowner then petitioned the county for an amendment to the 1987 growth policy. The landowner sought a revision that would have allowed for a mixed-use planned unit development on the entire parcel, including that portion acquired after the 2003 rezone. The board of county commissioners approved the growth policy amendment (2004 amendment). *Id.* at ¶ 10. The landowner then sought to rezone the entire parcel from suburban-agricultural and agricultural to residential and business. The county again approved the zone change (2005 rezone). *Id.* at ¶ 11.

¶26   These actions prompted the neighbors to file an amended complaint in which they challenged both the 2004 amendment to the growth policy and the 2005 rezone. *Id.* at ¶ 12. The county adopted a new growth policy (2007 growth policy) while the case was pending

10

on appeal. *Id.* at ¶ 13. The 2007 growth policy represented "a wholesale change from the 1987 Growth Policy," not a "mere refinement of the earlier document." Br. of Appellees at 12, *Country Highlands Homeowners Ass'n v. Bd. of County Comm'rs*, http://fnweb1.isd.doa.state.mt.us/idmws/custom/sll/sll_fn_home.htm (No. DA 06-0679, 2008 MT 286, 345 Mont. 379, 191 P.3d 424). The 2007 growth policy reflected significant demographic and land use changes that had occurred in the area in the twenty years since the 1987 growth policy had been adopted. *Country Highlands*, ¶ 13. These changes specifically included increased density and a change from agricultural to commercial and residential uses for the land that was the subject of the neighbors' suit.

¶27 We agreed with the county that its adoption of the 2007 growth policy had repealed and replaced the 1987 growth policy. The repeal of the earlier growth policy had rendered moot the issues raised by the neighbors. *Id.* at ¶ 16. The neighbors had requested that the Court "invalidate the 2004 Growth Policy amendment on the basis that it was inconsistent with the 1987 Growth Policy and then invalidate the 2005 Zoning District amendment because it was based on the flawed 2004 Growth Policy Amendment." *Id.* at ¶ 19. We recognized that this relief would not restore the neighbors to their original position. The 2005 rezone would continue to exist and be presumed valid under the 2007 growth policy. A challenge by a party still would be needed to determine whether the 2005 rezone "was consistent with the 2007 Growth Policy, which has superseded the 1987 Growth Policy." *Id.* at ¶ 22. We were unable to provide an effective remedy to the neighbors because "[t]he issue of whether the 2005 Zoning District amendment is consistent with the current 2007 Growth Policy is not before us for consideration." *Id.* The neighbors still would have needed to

11

challenge the 2005 rezone under the new 2007 growth policy in order to obtain the relief that they had requested.

¶28   *Country Highlands* does not stand for the proposition that a generalized zoning amendment that changes nothing about a disputed land use decision automatically ratifies such a decision. *Country Highlands* instead recognizes that subsequent legislative actions that effectively repeal an earlier legislative action may impede the ability of a court to provide meaningful relief to a party that has challenged the legality of the earlier legislative action. *Id.* at ¶ 22.  Moreover, *Country Highlands* involved an entirely new growth policy that constituted a "wholesale change" from the old growth policy.  This new growth policy incorporated explicitly the challenged zoning amendments.  The neighbors had based their claim solely upon the fact that the zoning amendments allegedly conflicted with the repealed growth policy.  *Id.*  The County's adoption of an entirely new growth policy that was presumptively consistent with the challenged zoning rendered moot the neighbors' claim.

¶29   Plains Grains, by contrast, did not challenge the 2008 rezone based on non-compliance with the growth policy.  Plains Grains challenged as impermissible spot zoning the legislative act that created the I-2 Heavy Industrial zone on the Urquhart/SME property.  The 2009 amendments to the CCZR had no effect on the zoning designation of the SME property or that of the surrounding agricultural zoned land.  The 2009 amendments focus on issues unrelated to the 2008 rezone, including changes to regulations dealing with "hoofed animals" on residential lots and setbacks for wind turbines.  Nothing in the County's documentation or the public comment surrounding the 2009 amendments mentions the zoning of SME's parcel or of any of the surrounding land.  No "wholesale change" in either

12

the growth policy or the surrounding zoning has repealed or superseded the County's 2008 decision to rezone the SME parcel. Nothing in our decision in *Country Highlands* precludes our consideration of Plains Grains' spot zoning claim.

¶30   SME argues in its second motion to dismiss that Plains Grains' failure to appeal the August 2009 amendments likewise rendered moot Plains Grains' spot zoning claim. SME cites specifically to the six-month statute of limitations for challenges to the "creation of a zoning district or adoption of zoning regulations" set forth in § 76-2-202(1)(b), MCA. Plains Grains timely challenged, however, the creation of the 668 acre I-2 zoning district in 2008.

¶31   Nothing about the challenged 2008 rezone depends on the growth policy or on an outdated version of the CCZR. The 2009 amendments to the CCZR changed nothing about the 668 acre rezone challenged by Plains Grains. The zoning designation and map remain unchanged for the SME parcel. The area surrounding the SME parcel retains its Agricultural designation. Plains Grains' spot zoning claim thus does not rely on the invalidity of an earlier legislative enactment that now has been superseded or repealed.

¶32   The Dissent takes the Court to task for failing to analyze the effect of the 2009 amendments on the zones surrounding the SME parcels. We do not dispute that our spot zoning analysis requires us to look at both the challenged parcel and the surrounding zones. We are unable to discern the basis for the Dissent's claim, however, that "[t]he rezoned parcel at issue in this case was thus placed within a completely new zoning context." Dissent, ¶ 100. Plains Grains pointed out in its supplemental brief that the Cascade County Planning Board's amended zoning map for the relevant parcels reflects identical zoning designations to those that existed before the challenged rezone. This map, included in the

13

record and reproduced below, reveals the same "sea" of Agricultural zoned land surrounding the 668 acre parcel of Heavy Industrial zoned land that existed before the 2009 amendments to the CCZR. More importantly, the land zoned Agricultural retains the same designation that it held before the 2009 amendments. As required by *Little*, we have analyzed both the challenged parcel and the surrounding zones. *Little*, 193 Mont. at 346, 631 P.2d at 1289. The fact that both SME's property *and* the surrounding zones retain their original designations under the new zoning ordinance supports our determination to evaluate whether the County engaged in impermissible spot zoning with respect to the 668 acre rezone notwithstanding the unrelated amendments to the CCZR adopted by the County in 2009.



Area rezoned I-2 Heavy Industrial March 2008

¶33     The 2009 amendments, moreover, do not purport to repeal the earlier version of the CCZR. The 2009 amendments to the CCZR represent merely a refinement of the previous version of the CCZR. The CCZR revisions sought to update the regulations, definitions, and certain zoning district boundaries and permitted land uses. The Dissent stresses that the County has reduced the total number of zones from 15 to 12. None of the zones combined with others by the County as part of the 2009 amendments in any way affected the zoning designations of either the SME parcel or the surrounding property. For example, the 2009

15

amendments added a new "multi-use" district adjacent to the Great Falls city limits, modified regulations for alternative energy production, and allowed for smaller lot sizes near the city of Great Falls. The 2009 amendments had no effect on the land use classifications challenged by Plains Grains. The County acknowledged as much in its notice of supplemental authority before this Court. The County noted that "the parcels at issue in this matter remained the same." Plains Grains points out that the old zoning map and the amended zoning map depict the parcels at issue in an identical manner: a "black island of Industrial land surrounded by a sea of green Agricultural land."

¶34 It is axiomatic that a court must be able to grant meaningful relief or restore the parties to their original position. *Powder River County v. State*, 2002 MT 259, ¶ 101, 312 Mont. 198, 60 P.3d 357. The 2009 amendments to the CCZR do not preclude a court from ruling on the legality of the 2008 rezone of the Urquhart/SME property. The question of the legality of the 2008 rezone remains alive. *Lohmeier*, ¶ 13. A remedy exists in light of the fact that a favorable ruling would restore Plains Grains to its original position – the 668 acres at issue would revert to its original Agricultural designation. SME, by contrast, has adduced no quantifiable evidence to support its argument that Plains Grains' claim is moot. SME claims that the delays caused by this litigation have cost it millions of dollars. SME has failed to substantiate its mootness claim in the record presented to this Court, however, by any accounting – or even a numeric estimate – of the losses it claims to have suffered. In the absence of such information, we are unable to determine SME's pre-rezone "status-quo." *Powder River*, ¶ 101. Consequently, we cannot determine whether SME's alleged

16

expenditure of millions of dollars has rendered moot Plains Grains' claim based on the record before us.

¶35 *Did Plains Grains' failure to seek a stay or injunction to prevent the sale or development of the land render moot its spot zoning claim?*

¶36 SME claims that the sale of the land by the Urquharts to SME rendered moot Plains Grains' spot zoning, conditional zoning, and public participation claims. SME argues that Plains Grains' failure to request a stay of the rezoning or the sale of the property now prevents it from raising these issues on appeal. *See e.g. Charlotte Mills, Clerk & Recorder v. Alta Vista Ranch*, LLC, 2008 MT 214, 344 Mont. 212, 187 P.3d 627. SME argues that our case law supports the proposition that a party's failure to seek a stay proves fatal to a litigant's case where the property has changed hands. SME predicates this claim on the argument that the transfer of property from the Urquharts to SME precludes the District Court from returning the parties to the status quo. SME further argues that the "millions of dollars" it has expended, combined with the procedural burden of obtaining "numerous permits," further renders impossible our ability to return SME to its status quo.

¶37 We first must address the Dissent's assertion that our Order in response to Plains Grains' petition for writ of supervisory control *required* Plains Grains to obtain a stay or injunction pending appeal. Our Order directed the District Court to issue a final judgment on all claims so that Plains Grains could seek review from this Court through the appeal process. The Order laid out the procedural requirements that Plains Grains would need to fulfill in order to seek a stay or an injunction pending appeal *should it choose to do so*. The Order did not direct affirmatively that Plains Grains seek a stay or an injunction pending

17

appeal. The Dissent claims that those advisory instructions render our Order the law of the case with regard to Plains Grains' failure to seek a stay or an injunction pending appeal. The Dissent misconstrues our law of the case precedent.

¶38     The Dissent cites a litany of cases for the proposition that "the decision, judgment, opinion or rulings *on former appeal or writ of error* become 'law of the case.'" Dissent, ¶ 74, quoting *Fiscus v. Beartooth Elec. Coop.*, 180 Mont. 434, 436, 591 P.2d 196, 197 (1979). The Dissent likens our Order on Plains Grains' petition for writ of supervisory control to an order on a "former appeal or writ of error." We did not state in the Order "a principle or rule of law necessary to the decision" affirmatively directing Plains Grains to seek a stay. *Carlson v. Northern Pac. Ry.*, 86 Mont. 78, 81, 281 P. 913, 914 (1929). We instructed the District Court to resolve any remaining claims and issue a final judgment. We observed that Plains Grains could then "decide *whether* to appeal and *whether* to seek a stay of the District Court's final judgment or an injunction pending appeal." Order Granting Pet. For Writ of Supervisory Control, *Plains Grains v. Eighth Jud. Dist.*, 5 (April 29, 2009) (OP 09-0054) (emphasis added). Our comments regarding the proper procedure for Plains Grains to follow in seeking a stay or injunction, should it choose to do so, do not constitute "a final adjudication" under *Carlson*.

¶39     The Dissent's attempt to equate Plains Grains' situation with that in *Murphy Homes, Inc. v. Muller*, 2007 MT 140, 337 Mont. 411, 162 P.3d 106, likewise falls short. Appellants sought emergency review of the district court's decision to bifurcate the trial and asked this Court to vacate upcoming trial dates. *Id.* at ¶ 50. We initially granted the petition and issued an order requiring the district court to give the parties at least 30 days notice before

18

scheduling a trial date. *Id.* at ¶ 51. We amended our order to require the district court to provide "reasonable notice" to the parties, however, following numerous unsuccessful attempts by the district court to comply with our order and dilatory tactics by the appellants. *Id.* at ¶ 53. Appellants argued on appeal that the lengthy interval between the bifurcated trial dates had prejudiced their cause. *Id.* at ¶ 55. We refused to address on appeal whether the District Court properly had bifurcated the trial in light of appellant's dilatory tactics and the district court's good faith efforts to comply with our order. We instead determined that the matter had "already been decided by this Court and may not be relitigated." *Id.* at ¶ 56.

¶40 Our Order on Plains Grains' request for writ of supervisory control presents no equivalent situation. Unlike in *Murphy*, we did not render a decision on the issue of whether Plains Grains had to seek a stay or injunction pending appeal. Our direction to the District Court to resolve any remaining claims and to issue a final judgment from which Plains Grains could appeal represented the only final decision provided by the Order. We made no decision on which path Plains Grains had to pursue following the District Court's resolution of any remaining claims and its issuance of a final judgment. This decision remained one for Plains Grains to make. Plains Grains opted for a path fraught with risk to its appeal. This risky decision by Plains Grains in no way violated, however, any "final adjudication" on any issue by this Court. *Carlson*, 86 Mont. at 82, 281 P. at 914. Our Order presents no "law of the case" roadblock to Plains Grains' pursuit of its appeal.

¶41 We next consider the Urquharts' sale of the land to SME. The District Court observed, with regard to the transfer of the property from the Urquharts to SME, that "the underlying status quo is not property ownership but the re-zoning determination by the

19

Cascade County Commissioners." The decisions of this Court cited by SME are distinguishable from the sale of the property by the Urquharts to SME. *Turner v. Mountain Eng'g. & Constr.,* 276 Mont. 55, 915 P.2d 799 (1996); *Henesh v. Bd. of Comm'rs.*, 2007 MT 335, 340 Mont. 239, 173 P.3d 1188; *Povsha v. City of Billings*, 2007 MT 353, 340 Mont. 346, 174 P.3d 515; *Mills*, 2008 MT 214, 344 Mont. 212, 187 P.3d 627.

¶42 The transfer of the property to a third party in each of these cases rendered moot the plaintiff's claim because the transfer of the property prevented the court from restoring the plaintiff to his original position. The subsequent valid sale of individual lots to bona fide third party buyers represented a "changed circumstance" that rendered moot the plaintiff's challenge to the subdivision as a whole. *See e.g. Povsha*, ¶ 19. The court in those cases faced a situation in which it no longer was able to grant plaintiffs' requested relief without implicating the validity of the third-party sales. *Id.* Though the parties to the suit had not changed, the sales also had the effect of fundamentally changing the character of the underlying land. The sale of lots in a subdivision inalterably modifies the single plot of land that had formed the basis of the plaintiffs' suit. A court's determination that the local governing body improperly approved a subdivision cannot return the parcel to its original configuration once lots have been sold to third parties. The challenging party cannot be restored to its pre-sale status quo by a decision invalidating the action of the governing body. *Id.* at ¶ 23.

¶43 The effect of the sale from the Urquharts to SME presents no similar barrier to a court's ability to provide relief. SME purchased the same 668 acre parcel for which the Urquharts sought the zone change. The 668 acre parcel remains intact. The sale from the

20

Urquharts to SME did not alter the property's legal identity. A decision by the court to invalidate the zone change simply would modify the zoning designation attached to that same 668 acre parcel. The Urquharts' application for rezoning referred to the planned sale to SME. A decision by a court to invalidate the zone change would not implicate the validity of the sale from the Urquharts to SME.

¶44 The Dissent contends that "*Povsha* is so squarely on point that it cannot be distinguished in good faith." Dissent, ¶ 86. We disagree. Povsha sought to enjoin a zoning change that would facilitate a commercial development on land that had been zoned for residential purposes. The commercial development was to house a wholesale automobile auction site. Povsha applied for a preliminary injunction on May 22, 2002, to prevent the construction of the commercial development. *Povsha*, ¶ 11. The district court denied Povsha's application on June 18, 2002, and he did not appeal. *Povsha*, ¶ 11.

¶45 Povsha continued to litigate the merits of his spot zoning claim while the commercial development proceeded apace. The district court eventually rejected Povsha's spot zoning claim nearly four years later on February 14, 2006. *Povsha*, ¶ 16. The developer had completed construction of the wholesale automobile auction site during the four years between Povsha's filing for a preliminary injunction in 2002 and the district court's denial of Povsha's spot zoning claim in 2006. The auction site had been operating with its "emissions and noise from the idling diesel engines of semi-trucks making deliveries; the sight of countless parked vehicles, and the glare of the facility's lighting which remained on throughout the night." Br. of Appellant at 15, *Povsha v. City of Billings*,

21

http://fnweb1.isd.doa.state.mt.us/idmws/custom/sll/sll_fn_home.htm (No. DA 06-0204, 2007 MT 353, 340 Mont. 346, 174 P.3d 515). The original owner had gone out of business by 2004 and had sold the facility to a new owner who had continued to operate the auction site up through the time of Povsha's appeal. Povsha conceded on appeal "that for all intents and purposes, the damage in this case has already been done." *Povsha,* ¶ 18.

¶46 The "damage" that Plains Grains seeks to avoid has not already been done. Plains Grains seeks to prevent the construction and operation of a large industrial facility on land that previously had been zoned for agricultural purposes. The Dissent suggests that SME has obtained numerous permits at substantial cost that it needed "in order to commence construction of the HGS." Dissent, ¶ 93. The Dissent further argues that SME has commenced construction of the HGS, "expending millions of dollars to develop the property – in accordance with its legal right to do so." Dissent, ¶ 94. It seems far from clear, however, that SME possessed the necessary permits that would have given it a legal right to develop the property or that the procedural burdens it cites remain relevant to its current proposal for a natural gas fired power plant.

¶47 SME initially commenced construction in the form of earthmoving and site preparation for a proposed coal fired power plant. SME never obtained financing for the actual construction of its proposed coal fired power plant. More importantly, DEQ forced SME to halt its premature earthmoving and site preparation due to the fact that SME had not yet obtained a permit for this activity. DEQ issued a Notice of Violation to SME. SME eventually requested that DEQ revoke its air quality permit to construct the coal fired power

22

plant when it failed to secure funding for the plant. SME's request for a change from a coal fired plant to a gas fired plant relates to any inquiry as to SME's pre-rezone "status quo."

¶48 We cannot determine from the record whether SME indeed has spent "millions of dollars" to develop the property for a gas powered facility. Moreover, SME had not yet obtained its final air quality permit that would allow it to construct the proposed HGS at the time that the parties submitted their briefs on appeal. The County estimates that SME has expended "approximately $40 million" in the purchase and development of the 668 acre parcel. SME acted as a party to the proposed zone change from the outset. The sale of the property from the Urquharts to SME did not render moot Plains Grains' spot zoning claim. It would be inappropriate to include as part of our mootness analysis the purchase price in the millions of dollars allegedly expended by SME.

¶49 The District Court earlier had rejected a similar claim on the basis that the zoning designation, rather than the property ownership, represents the "underlying status quo." Mootness revolves around a court's ability to restore the parties to their original position. *Powder River County*, ¶ 101. Plains Grains easily could have found themselves in a position similar to the neighboring landowner in *Povsha*. The completion and operation of the HGS would have eliminated this Court's ability to provide relief to Plains Grains. *Povsha*, ¶ 23. SME makes no such claim on appeal. SME likewise does not substantiate with particularity its claim that it had spent millions of dollars during the pendency of this litigation. SME instead contends that the millions of dollars that it has expended in preparing the site for construction deprives this Court of the ability to return it to the status quo. We cannot evaluate the accuracy of SME's generalized claim that it has expended "millions of dollars"

23

in preparing the site for construction based on the record presented on appeal. It is well established that we must confine our review to the record. *Federated Mut. Ins. Co. v. Anderson*, 277 Mont. 134, 138, 920 P.2d 97, 100 (1996). Similarly, SME's alleged expenditure of millions of dollars does not constitute a fact of which this Court can take judicial notice. M. R. Evid. 201; *In re S.T.,* 2008 MT 19, ¶ 17, 341 Mont. 176, 176 P.3d 1054. As a result, we cannot conclude based on the record presented on appeal that SME's alleged expenditure of millions of dollars has rendered moot Plains Grains' spot zoning claim.

¶50 We agree with the District Court that the "underlying status quo" involves the zoning designation and not property ownership. The transfer of the property from the Urquharts to SME does not constitute a changed circumstance that moots Plains Grains' claims. *Lohmeier*, ¶ 13. SME does not stand in the shoes of a third party buyer in the same sense as the bona fide purchaser of property at a sheriff's sale (*Turner*), or the bona fide purchaser of a lot in a subdivision (*Henesh*, *Povsha*, and *Mills*). SME stands in the shoes of the Urquharts as petitioner for the zone change. Plains Grains' spot zoning claim survives the sale of the property from the Urquharts to SME.

¶51 *Did the rezoning of 668 acres of land from Agricultural to Heavy Industrial constitute impermissible spot zoning?*

¶52 Plains Grains claims that the rezoning of 668 acres of land from agricultural to heavy industrial constitutes impermissible spot zoning. The County and SME counter that the construction of the HGS did not require rezoning. The District Court determined that Plains Grains could not satisfy the *Little* test based on its determination that SME could construct

24

the HGS through the special use permit process without obtaining a zone change. The District Court acknowledged that important indicators of spot zoning were present. The District Court placed greater weight, however, on two internal planning staff reports that concluded that the HGS would have been allowed within the existing Agricultural zoning district with a special use permit. As a result, the District Court determined that conversion from agricultural to industrial use would not constitute a significantly different use from those prevailing in the area.

¶53 Plains Grains argues that the District Court incorrectly conflated activities allowed "as of right" in a given zone with those allowed only under a special use permit. Plains Grains argues that a fundamental difference exists between the administrative procedures involved in obtaining a special use permit and the quasi-legislative process required for a zone change. A party must seek a special use permit from the board of adjustment, an administrative body appointed by the county commission, an elected body. Section 76-2-221, MCA. The county commission itself must approve a zone change. Section 76-2-205(6), MCA.

¶54 We need not determine definitively whether SME could have obtained a special use permit to build the generating station. The District Court's determination that the HGS would have been allowed under a special use permit implies that the issuance of a special use permit constitutes a ministerial act over which the board exercises no discretion. *Beasley v. Flathead County Bd. of Adjustments*, 2009 MT 120, ¶ 17, 350 Mont. 171, 205 P.3d 812. The board of adjustment exercises considerable discretion, however, with respect to whether to grant a special use permit. Section 76-2-223, MCA; *See also Beasley*, ¶ 18. For instance, a property owner in *Beasley* sought a writ of mandate to compel the board of adjustment to

grant the transfer of a conditional use permit (CUP) obtained by the previous owners. The CUP would have allowed the property owner to operate a gravel pit. We denied the request on the grounds that a writ of mandate cannot be used to compel a discretionary act. *Beasley*, ¶ 18.

¶55 SME likely would face more than a mere ministerial act in seeking to obtain a special use permit to construct the HGS. Section 8 of the Cascade County Zoning Regulations provide that a "special use is a use for which conformance to additional standards will be required and shall be deemed to be a permitted use in its respective district." Section 8 enumerates the procedural requirements to obtain a special use permit. These requirements include the submission of a site plan, public notice, and a hearing process.

¶56 The Board may not issue a special use permit unless it first makes five required findings. These findings include that the proposed development will not "materially endanger" the public health, safety, or welfare; that the development will not harm surrounding property values unless it is deemed to be a public necessity; and that the development will be "in harmony" with the area in which it is to be located. The petitioner bears the burden of presenting sufficient evidence to allow the board to make each of the required findings. Nothing in the CCZR compels the Board to issue a special use permit once it makes the required findings. This fact suggests that the granting of a special use permit is a discretionary act.

¶57 SME cited the rezone as a "prerequesite" to building the HGS in its petition for rezoning. SME arguably had two procedural paths open to it. Both paths required public notice, a hearing, and a comprehensive application process. SME opted for rezoning because

26

it wished simultaneously to create a tax increment financing district to help finance the HGS. The rezone became truly a "prerequisite" to building the HGS once SME elected to proceed down the quasi-legislative path of a rezone application. The District Court improperly concluded that the availability of the special use permit option rendered unnecessary SME's zone change request even though SME elected to pursue rezoning rather than seeking to obtain a special use permit. The fact that SME arguably could have pursued a special use permit does not undermine Plains Grains' spot zoning claim.

¶58 We turn then to the merits of Plains Grains' spot zoning claim. Whether impermissible spot zoning has occurred presents a fact-specific inquiry that will vary from one case to the next. *Little*, 193 Mont. 334, 346, 631 P.2d 1282, 1289. The presence of three conditions generally will indicate, however, that a given situation constitutes spot zoning, regardless of variations in factual scenarios. *Id*.

¶59 The first prong of the three-part *Little* test examines whether the requested use would differ significantly from the prevailing land uses in the area. *Id*. The second prong explores whether the area requested for the rezone would be "rather small" in terms of the number of landowners benefitted by the requested zone change. *Id*. Finally, the third prong analyzes whether the requested zone change would be in the nature of "special legislation" designed to benefit one or a few landowners at the expense of the surrounding landowners or the public. *Id*. A court must analyze the second and third prongs of the *Little* test in concert. *Boland v. City of Great Falls*, 275 Mont. 128, 134, 910 P.2d 890, 894 (1996). The number of landowners benefitted by the zone change speaks directly to the issue of whether the

27

requested change constitutes special legislation in favor of one or a small number of landowners. *Id.*

¶60     We first must determine "whether the requested use differs from the prevailing use in the area." *North 93 Neighbors, Inc. v. Bd. of County Comm'rs*, 2006 MT 132, ¶ 65, 332 Mont. 327, 137 P.3d 557 (citing *Little*, 193 Mont. at 346, 631 P.2d at 1289). The District Court acknowledged that there "unquestionably" would be a change from the current agricultural use to the proposed heavy industrial use represented by the HGS. The County cites *North 93 Neighbors* for the proposition that a court applying the first prong of the *Little* test may look to the land uses allowed under current zoning rather than the prevailing uses in the area. We analyzed the land uses allowed by current zoning in *North 93 Neighbors* only *after* we thoroughly had considered the existing uses in the area. Our conclusion that the prevailing uses were not significantly different from the proposed use was based on our consideration of both the prevailing uses *and* the uses allowed by current zoning. *Id.* Thus a court may consider the existing zoning in addition to prevailing uses. Nothing in *North 93 Neighbors* directs a court to consider what uses would be available under existing zoning in lieu of prevailing uses, as the County suggests.

¶61     We further distinguish *North 93 Neighbors* from the instant facts in that the proposed rezone in that case would have constituted merely an extension of existing zoning. We observed in *North 93 Neighbors* that "[e]xtending a preexisting zone classification to include a larger area does not constitute spot zoning." *North 93 Neighbors*, ¶ 67 (citing *State ex rel. Gutkoski v. Langhor*, 160 Mont. 351, 353, 502 P.2d 1144, 1146 (1972)). By contrast, the

28

proposed rezone to facilitate construction of the HGS would create an island of heavy industrial zoning within a large area zoned for agricultural use.

¶62    Finally, the County's reliance on *North 93 Neighbors* fails because existing zoning adjacent to the proposed rezone in that case allowed for commercial use as of right. *North 93 Neighbors*, ¶ 66.  Here, as Plains Grains points out, SME's proposed use would be allowed – if at all – only by the granting of a special use permit.  The District Court applied the wrong test in rejecting the first prong of the *Little* spot zoning analysis.  The District Court concluded that the requested use of the 668 acres for the proposed rezone would differ significantly from surrounding uses.  SME does not challenge seriously this conclusion. Plains Grains has established the first prong of the *Little* test.

¶63    The second prong of the *Little* spot zoning test looks at whether the size of the parcel to be rezoned would be "relatively small."  Consideration of the actual size of the parcel comprises only one element of this inquiry, but nonetheless constitutes a relevant factor. This Court determined in *Greater Yellowstone Coalition, Inc. v. Bd. of Comm'rs*, 2001 MT 99, 305 Mont. 232, 25 P.3d 168, that the County had engaged in impermissible spot zoning of a 323 acre parcel that comprised "a mere 2% of the District's 13,280 acres." *Greater Yellowstone Coalition*, ¶ 26.  The 668 acres at issue in this case comprise a similarly small percentage of the land zoned for agriculture in Cascade County.  The District Court acknowledged that Plains Grains "appears to have a compelling argument" with regard to the relatively small size of the area to be rezoned.

¶64    The number of landowners affected by the proposed rezone must be analyzed in concert with the third factor – whether the proposed zone change constitutes "special

29

legislation." *North 93 Neighbors,* ¶ 68 (citing *Boland,* 275 Mont. at 134, 910 P.2d at 894). The number of landowners affected relates directly to whether the zoning constitutes special legislation designed to benefit one person. *North 93 Neighbors,* ¶ 68. This inquiry should focus on the benefits of the proposed rezone to surrounding landowners, not the benefits – financial or otherwise – that would accrue from the proposed development. *Boland,* 275 Mont. at 134, 910 P.2d at 894. The Urquharts' application for rezoning acknowledged that grain farming and cattle ranching constituted the predominant surrounding land uses. The Staff Report likewise confirms that agricultural production dominates the surrounding land uses.

¶65   The District Court found that "one landowner (be it viewed as either SME, the current deed holder, or the Urquharts, the applicants) will benefit at the expense of others." The court recognized that these costs constituted "not merely the location of a power plant in the 'Back 40' but the power lines, rail spurs, and other industrial detritus of a large, power generating facility." The court acknowledged that the impacts of this special legislation would be "imposed on some landowners by way of eminent domain." We agree. No discernible benefit for the rezone would accrue to the neighboring farmers and ranchers. The benefits of the rezone inure solely to the owners of the 668 acres, first the Urquharts and now SME.

¶66   The District Court based its determination that no spot zoning had occurred on its conclusion that the zone change "was in name only" and did not change the uses allowed under the existing Cascade County regulations. Our application of the *Little* factors reveals, however, that the rezoning of the HGS property constituted spot zoning. The requested

30

heavy industrial use differs significantly from the current agricultural uses that dominate the surrounding area. The area to be rezoned is relatively small – both in absolute size and in terms of landowners affected. The proposed rezone smacks of "special legislation" in that the benefits would accrue to a single landowner to the detriment of the surrounding farmers and ranchers. *Little*, 193 Mont. at 346, 631 P.2d at 1289.

## CONCLUSION

¶67    The County's adoption of the 2009 amendments to the CCZR did not render moot Plains Grains' spot zoning claim. The amendments did not change the rezoning at issue in this litigation. The 2009 amendments to the CCZR do not preclude us from granting Plains Grains the relief that it has requested. We deny SME's motion to dismiss the appeal as moot based upon Plains Grains' failure to challenge the 2009 amendments to the CCZR. The sale of the property from the Urquharts to SME likewise did not render moot Plains Grains' claims.

¶68    We reverse the District Court's order granting summary judgment to SME and grant judgment in favor of Plains Grains on its spot zoning claim. We also deny SME's motion to dismiss the appeal as moot based on SME's alleged expenditure of millions of dollars to prepare the 668 acres for a gas fired power plant.

¶69    We need not address Plains Grains' remaining claims in light of our determination that the rezoning of the HGS property constituted impermissible spot zoning.


/S/ BRIAN MORRIS


31

We Concur:

/S/ MIKE McGRATH
/S/ W. WILLIAM LEAPHART
/S/JEFFREY SHERLOCK
District Court Judge Jeffrey Sherlock,
sitting in for former Justice John Warner

Justice Jim Rice, dissenting.

¶70 I believe the Court's analysis is deeply flawed and evades the clear principles of our jurisprudence. This appeal has been mooted—several times over. There is simply no defensible way to reconcile the Court's decision in this case with our contrary precedent, and I dare say that no lawyer will now be able to explain this Court's mootness jurisprudence, except by observing that this Court will arbitrarily moot those cases it doesn't want to decide, while reaching the merits on identically situated cases if it so desires. Ultimately, the legal standards simply do not matter.

¶71 I begin by advising the reader of our previous order in this case and then turn to mootness principles.

¶72 ***1. The Law of the Case***

¶73 Previously, we issued an Order in response to Plains Grains' Petition for Writ of Supervisory Control, which had requested that we order the District Court to rule on all dispositive issues of the case so Plains Grains could appeal the spot-zoning issue. We granted the Writ, and provided the following instructions in our Order:

> The District Court should resolve any remaining claims in Plains Grains' complaint and issue a final judgment. *At that point, Plains Grains can decide whether to appeal and whether to seek a stay of the District Court's final judgment or an injunction pending appeal.* Plains Grains first must file with the District Court any request for a stay or an injunction pending appeal. M.R.App.P.22(1)(a)(i) and (iii). A district court retains jurisdiction to rule on any motion for stay even after the appellant has filed a notice of appeal. M.R.App.P.22(1)(c). *The district court promptly must enter a written order on a motion filed M.R.App.P.22* and include findings of fact and conclusions of law, or a supporting rationale, that contains the relevant facts and legal authority on which the district court's based its order. M.R.App.P.22(1)(d). *This Court retains the authority to review any decision by the district court*

33

*regarding the stay of execution of a judgment or the denial or granting of an injunction pending appeal.  M.R.App.P.22(2).*

Order Granting Pet. for Writ of Supervisory Control, *Plains Grains v. Eighth Jud. Dist.*, 5 (April 29, 2009) (OP 09-0054).

¶74     Our Order instructed Plains Grains and the District Court, in step-by-step fashion, what procedure to follow for addressing either a stay or an injunction if the matter was appealed.  These instructions became the "law of this case," which is "well established and long adhered to in this state."  *Carlson v. Northern Pac. Ry. Co.*, 86 Mont. 78, 81, 281 P. 913, 914 (1929); *Scott v. Scott*, 283 Mont. 169, 175-76, 939 P.2d 998, 1001-02 (1997) (citations omitted).  In the seminal *Carlson* decision, we held that a previous ruling by this Court "upon a point distinctly made . . . is a final adjudication from the consequences of which this court may not depart, nor the parties relieve themselves."  *Carlson*, 86 Mont. at 82, 281 P. at 914 (collecting numerous cases and authorities for this proposition).  In *Fiscus v. Beartooth Electric Cooperative, Inc.*, we further defined "law of the case" in holding that the "decision, judgment, opinion or rulings *on former appeal or writ of error* become 'law of the case.' . . .  The doctrine expresses practice of courts generally to refuse to reopen what has been decided."  180 Mont. 434, 436, 591 P.2d 196, 197 (1979) (emphasis added).  We have applied the law of the case to dispose of an issue addressed in a *denial* of an Appellant's Application for Writ of Supervisory Control.  *Murphy Homes, Inc. v. Muller*, 2007 MT 140, ¶¶ 50-51, 56, 337 Mont. 411, 162 P.3d 106.[1]  Our cases have consistently applied the law of the case doctrine.[2]

---

[1] The Court asserts that this Dissent "attempt[s] to equate Plains Grains' situation with that in *Murphy Homes, Inc.*" Opinion, ¶ 39, and then proceeds to discuss *Murphy* at length to distinguish

¶75   Our previous Order instructed that, once the District Court had ruled on the dispositive issues of the case, "Plains Grains [could] decide whether to appeal and whether to seek a stay of the District Court's final judgment *or* an injunction pending appeal." The District Court was instructed to enter findings of fact, conclusions of law and rationale regarding Plains Grains' request for a stay or injunction. However, Plains Grains did not follow our instructions, and the District Court entered no order addressing the stay or injunction issues. Without a stay or an injunction, Plains Grains risked having their appeal mooted for a variety of reasons and, indeed, Plains Grains' appeal has been mooted because of the post-judgment developments discussed below.

¶76   Plains Grains makes repeated references to the District Court's statement that "[a] stay would require a bond that would cover the prospective damages to Defendants due to delayed construction [and] such a bond could be astronomical," as justification for their failure to even request a stay or seek an injunction. However, our Order instructing the parties on a post-appeal stay came *after* the District Court's comments, effectively vacating them. Setting that aside for a moment, the District Court and Plains Grains both ignored the

---

the two cases. However, the Dissent does not do so. *Murphy* is cited here merely to demonstrate the scope of the law of the case doctrine. The Court's analysis of the facts of *Murphy* is a straw man argument.

[2] *See In re Estate of Snyder*, 2009 MT 291, ¶ 6, 352 Mont. 264, 217 P.3d 1027 ("The law-of-the-case doctrine is based on policies of judicial economy and finality of judgments[;] a prior decision of this Court resolving an issue between the same parties is binding and may not be relitigated."); *Muri v. Frank*, 2003 MT 316, ¶ 11, 318 Mont. 269, 80 P.3d 77; *In re Potts*, 2007 MT 236, ¶ 33, 339 Mont. 186, 171 P.3d 286; *Jacobsen v. Allstate Ins. Co.*, 2009 MT 248, ¶ 29, 351 Mont. 464, 215 P.3d 649 (citing Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* vol. 18B, § 4478.3, 733 (3d ed., West 2005)); *Moody v. Northland Royalty Co.*, 286 Mont. 89, 92-93, 951 P.2d 18, 20-21 (1997); *Hafner v. Conoco, Inc.*, 1999 MT 68, ¶ 20, 293 Mont. 542, 977 P.2d

rules of civil and appellate procedure and the rights of Appellees, who are entitled to proceed upon the judgment failing entry of an injunction or stay, or be given assurances by a bond that they will be compensated for any further delays. If the District Court and Plains Grains had consulted the law, they would have discovered that M. R. App. P. 22(3) provides that, "[i]n the interests of justice," this Court "may grant, modify, or deny the relief requested." *See Turner v. Mt. Eng'g. & Constr., Inc.*, 276 Mont. 55, 62, 915 P.2d 799, 804 (1996) ("On application, the supreme court in the interest of justice may suspend, modify, restore, or grant any order made under this subdivision."). As such, this Court is empowered to consider equitable issues when addressing the bond, which would include allegations of the feasibility or "astronomical-ness" of the price of justice. We explained this exact principle in our previous Order: "This Court retains the authority to review any decision by the district court regarding the stay of execution of a judgment or the denial or granting of an injunction pending appeal. M.R.App.P.22(2)." Moreover, Plains Grains needed no money to seek an injunction. Nonetheless, Plains Grains, without citation to authority and without making any argument to excuse its obligation, simply elected to ignore its obligation to seek to stay or enjoin the judgment. That left Appellees fully within their rights to proceed on the judgment, which is exactly what they have done.

¶77 As noted, this discussion is academic, as the District Court's order hypothesizing about how "astronomical" the bond would need to be was superseded by our Order instructing the District Court to "enter a written order" and "include findings of fact and

---

330; *State v. Gilder*, 2001 MT 121, ¶¶ 8-12, 305 Mont. 362, 28 P.3d 488 (collecting cases). [All internal citations omitted.]

36

conclusions of law, or a supporting rationale, that contains the relevant facts and legal authority . . . regarding the stay of execution of a judgment or the denial or granting of an injunction pending appeal." That Order is the law of the case. Appellants ignored our Order. The District Court ignored our Order and failed to enter the appropriate order. Now, this Court joins in ignoring our Order.

¶78 In response, the Court minimizes our Order, stating that law of the case principles extend only to that "portion" of the Order instructing the District Court to rule on the substantive merits of the case, and that our instructions for requesting a stay or injunction on appeal, as well as our instruction to the District Court to enter a complete order on this issue, were merely "advisory instructions" or "comments" regarding the proper procedures to be followed. Opinion, ¶¶ 37-40. The Court here misses the critical point: even assuming *arguendo* that our Order was merely "advisory" and our "comments" did not constitute the law of the case, they were nonetheless statements of *the law.* Our instructions to the parties and the District Court reiterated the appellate procedure that Plains Grains was required to follow *without* an order from this Court. Yet, Plains Grains failed to do so.

¶79 *2. Mootness*

¶80 This case has been mooted because Plains Grains failed to stay or enjoin the proceedings and we cannot now grant effective relief or restore the parties to their original positions. Appellees have legally acted upon the judgment. Further, Cascade County has been completely rezoned—reducing the total number of zones in the County from 15 to 12—and a challenge to the new zoning map and regulations is not before us.

¶81 *a. Failure to Stay or Enjoin the Proceedings*

¶82 A case becomes moot when this Court cannot grant or fashion effective relief, or restore the parties to their original position.[3] Because the parties must be able to be returned to their original positions, this Court has repeatedly warned Appellants to seek a stay of the proceedings, or request an injunction, to preserve the parties' status quo pending an appeal.[4] If they fail to do so, the case may be mooted because the Court cannot fairly return a party back to his or her position. For example, without a stay or injunction, one of the parties might sell the property or business in question, *see Turner*, 276 Mont. at 59-63, 915 P.2d at 802-04, or a party might construct a building, at great expense, on questionably rezoned property, *see Povsha*, ¶¶ 18-24. We cannot undo the sale of land or a business, nor can we deconstruct buildings. We cannot address the merits of such disputes in good conscience because we cannot return parties to the status quo without causing great economic harm. We

---

[3] *State ex rel. Hagerty v. Rafn*, 130 Mont. 554, 559-60, 304 P.2d 918, 921 (1956); *Gallatin Trust & Sav. Bank v. Henke*, 154 Mont. 170, 176-77, 461 P.2d 448, 451-52 (1969), *overruled on unrelated grounds*, *LeClair v. Reiter*, 233 Mont. 332, 335, 760 P.2d 740, 742 (1988); *First Sec. Bank of Kalispell v. Income Props., Inc.*, 208 Mont. 121, 126-27, 675 P.2d 982, 984-85 (1984); *Martin Dev. Co. v. Keeney Constr. Co.*, 216 Mont. 212, 218-20, 703 P.2d 143, 147-48 (1985) (clarifying our mootness jurisprudence in light of *Hagerty*, *Gallatin* and other cases); *Turner*, 276 Mont. at 59-63, 915 P.2d at 802-04; *In re Marriage of Gorton*, 2008 MT 123, ¶ 16, 342 Mont. 537, 182 P.3d 746 (citing *Billings High Sch. Dist. No. 2 v. Billings Gaz.*, 2006 MT 329, ¶ 12, 335 Mont. 94, 149 P.3d 565).

4 *First Sec. Bank*, 208 Mont. at 126-27, 675 P.2d at 984-85; *Martin Dev.*, 216 Mont. at 218-20, 703 P.2d at 147-48; *Turner*, 276 Mont. at 59-63, 915 P.2d at 802-04; *Van Troba v. Mont. State Univ.*, 1998 MT 292, ¶ 35, 291 Mont. 522, 970 P.2d 1029; *Shamrock Motors, Inc. v. Ford Motor Co.*, 1999 MT 21, ¶¶ 19-22, 293 Mont. 188, 974 P.2d 1150; *Billings High*, ¶¶ 12-21; *City of Bozeman v. Taylen*, 2007 MT 256, ¶¶ 29-30, 339 Mont. 274, 170 P.3d 939; *Henesh v. Bd. of Commrs. of Gallatin Co.*, 2007 MT 335, ¶¶ 5-6, 340 Mont. 239, 173 P.3d 1188; *Povsha v. City of Billings*, 2007 MT 353, ¶¶ 18-24, 340 Mont. 346, 174 P.3d 515; *Gorton*, ¶¶ 16-18; *Mills v. Alta Vista Ranch, LLC*, 2008 MT 214, ¶ 22, 344 Mont. 212, 187 P.3d 627; *Country Highlands Homeowners Assn. v. Bd. of Co. Commrs. of Flathead Co.*, 2008 MT 286, ¶ 16, 345 Mont. 379, 191 P.3d 424; *City of Whitefish v.*

have thus made it incumbent upon the appealing party to stay or enjoin the proceedings, and thereby preserve the status quo, to prevent this very harm. We have never wavered from this position.

¶83 In *Turner*, we dismissed an appeal by the lien-holders of the foreclosed "Royal Village" subdivision property as moot, because the property had been sold and the "Appellants allowed [the] foreclosure sale to proceed, did not stay the proceedings, and did not post a supersedeas bond." Consequently, it was "impossible for this Court to grant effective relief" because the subject property had been sold and the parties could "not be returned to the status quo." *Turner*, 276 Mont. at 63, 915 P.2d at 804.

¶84 Our unanimous opinion in *Henesh* likewise followed these established principles. Henesh filed suit in the district court against Gallatin County over a preliminary subdivision plat approval, alleging the Commissioners' decision was unlawful. While the action was pending, the County approved the "Dry Minor Subdivision," and the Estate owner began selling the lots in the subdivision. We dismissed Henesh's appeal on mootness grounds, explaining the opportunities she had to apply for a stay or an injunction to preserve her claims, including an injunction preventing final approval of the subdivision while the action was pending in the district court, or an injunction or stay of execution following the district court's summary judgment order, or an appeal to this Court from any denial of a stay or injunction. Because Henesh "failed to seek available remedies to preserve the *status quo* pending appeal," we held she could not "be heard to complain because the Estate and the

*Bd. of Co. Commrs. of Flathead Co.*, 2008 MT 436, ¶¶ 23-27, 347 Mont. 490, 199 P.3d 201. [All subsequent case histories and internal citations omitted.]

County continued with the process to secure final approval." *Henesh*, ¶¶ 3-7 (emphasis in original).

¶85 The Court avoids the consequences of these holdings, in part, by hiding them within string cites which follow inaccurate summaries. It characterizes *Turner* and *Henesh*, as well as *Povsha* and *Mills*, discussed below, as addressing the sale of land or property which renders an appeal moot. Opinion, ¶ 41. The Court then offers that the spot zoning context of this case is so different than the "subdivision" context of *Turner*, *Henesh*, *Povsha*, and *Mills* that disregarding our settled principles of mootness law is here warranted. However, the Court's characterizations of these cases are inaccurate and it offers no reasoned explanation of why established mootness principles should somehow not apply in a zoning case.

¶86 Our decision in *Povsha* is so squarely on point that it cannot be distinguished in good faith. Contrary to the Court's characterization, *Povsha* did not merely involve a subdivision. Incredibly, the Court misses that it also involved the exact issue involved here—a spot-zoning challenge. The issue in *Povsha* was whether the City unlawfully subdivided and rezoned land in South Billings from "Agricultural-Open" to "Urban Study Area" for the sole purpose of developing the study area "for commercial uses." A commercial interest had applied for the zoning change to allow construction of a wholesale auto auction house, and the City's Development Review Committee held a public review meeting to discuss it. Appellant Povsha and numerous other landowners raised substantial concerns about the incompatibility of the rezoning proposal with the surrounding residential area and nearby Riverfront Park. Following the public hearing, the Review Committee voted to recommend

denial of the proposed zone change, due primarily to the incompatibility of the proposed auto auction house with the surrounding residential area. *Povsha*, ¶¶ 1-10.

¶87    The City Council, however, rejected the Committee's recommendations and approved the zoning change. Povsha then filed a complaint in the district court, seeking to enjoin and set aside the zoning change and corresponding subdivision approval. Povsha also filed an application for a preliminary injunction to prevent the development of the auto auction house from going forward. The district court held an evidentiary hearing on the request for a preliminary injunction, and denied Povsha's application. Povsha did not appeal the district court's denial of the request for preliminary injunction. *Povsha*, ¶¶ 10-11.

¶88    Relying extensively on *Henesh*, we concluded that Povsha's appeal had been mooted because Povsha had not stayed or enjoined the proceedings pending appeal and the auto auction house had been built pursuant to the judgment. We *again* outlined the process for appealing the trial court's denial of Povsha's request for injunctive relief under M. R. App. P. 6(3)(e), or moving the district court and this Court "to stay *the zoning change* and subdivision proceedings in the City and County under M. R. App. P. [22], before those proceedings became final." *Povsha*, ¶ 23 (emphasis added). Povsha had not availed himself of any of these remedies. As we later explained, "[n]otably, we chided the applicants in both *Povsha* and *Henesh* for failing to appeal the district court's denial of the request for injunctive relief or for failing to seek a stay of proceedings until the parties could reach a resolution on the merits. We explained that we could not restore the parties to their original positions . . . ." *City of Whitefish*, ¶ 23 (citing *Povsha*, ¶ 23 and *Henesh*, ¶ 5).

41

¶89 *Povsha* is strikingly similar to the case here and, where it is different, the case for mootness is stronger here than in *Povsha*. The issue here is whether the County unlawfully rezoned the Urquhart's land in Northeast Cascade County from agricultural to commercial, for the sole purpose to 'permit, construct and operate the Highwood Generating Station (HGS).' The Cascade County Planning Department's staff report actually *recommended* the rezoning change, whereas the City's Development Review Committee in *Povsha* voted to deny the zone change. The Cascade County Planning Board and the Cascade County Commissioners thereafter held extensive public comment sessions to discuss the proposed zone change. Appellant Plains Grains and numerous other landowners, like those in *Povsha*, raised substantial concerns about the incompatibility of the rezoning proposal with the surrounding character of the land. Following these public hearings, the Commissioners voted to approve the Urquhart's rezoning request. Plains Grains then filed their complaint in the District Court, challenging the rezoning approval on a variety of claims including spot zoning and improper public participation, but did not prevail.

¶90 At no time did Plains Grains request a stay of the judgment or an injunction in these proceedings, either from the District Court or this Court. *See Povsha*, ¶ 23. Simply put, Plains Grains did not avail themselves to *any* remedy under the law to preserve their claims or the status quo of the parties. Indeed, the appellants in *Povsha* actually did *more* to preserve the status quo by requesting an injunction than Plains Grains, who did nothing. Nonetheless, we dismissed their appeal as moot because they failed to avail themselves of further remedies under the rules.

¶91   The Court responds to this presentation of our mootness jurisprudence by attempting to distinguish *Povsha*, and the lengths it goes to do so are astonishing. First, the Court departs from the opinion and actual holding of *Povsha* and includes information included only in the *briefs* of that case, without attribution. Opinion, ¶ 45. If this information was not pertinent when we decided *Povsha*, it certainly is not pertinent now. It then focuses on minutia from the case, apparently to imply that *Povsha* does not govern because of minor factual differences. However, this is not a principled distinguishment of controlling precedent. Under the Court's approach, *any* case is distinguishable.

¶92   Then, the Court offers that *Povsha* is distinguishable because "[t]he 'damage' that Plains Grains seeks to avoid has not already been done," Opinion, ¶ 46, and asserts that only the "completion and operation of the HGS would have eliminated this Court's ability to provide relief to Plains Grains." Opinion, ¶ 49. In other words, the Court holds that only if the challenged project, which prevailed in the district court, has become *fully completed and operational*, can a case be considered moot on appeal. This is not the law of judgment execution and stays of judgments, discussed below, but for purposes of the point here—the holding of *Povsha*—it is not the law of mootness, either. "If this Court *cannot restore the parties to their original position*, the appeal becomes moot." *Povsha*, ¶ 23 (emphasis added, citations omitted). The proper question is whether this Court can restore the parties to their original position, not whether the challenged action has progressed to completion. This Court cannot now restore Southern Montana Electric (SME) to its original position.[5]

---

[5] Our mootness jurisprudence includes more than *Povsha*, but the Court does not address, in response, the additional contrary holdings in *Turner*, *Henesh*, and *Mills*.

43

¶93 Consequently, following entry of judgment in favor of Appellees, and during the pendency of this appeal, Appellees proceeded on the judgment and the status quo of the parties changed substantially. The Urquharts sold the rezoned property to SME, who then recorded their deeds with the Office of the Cascade County Clerk and Recorder. At substantial cost, SME obtained numerous additional permits it was required to obtain in order to commence construction of the HGS. SME was under a specific deadline to commence construction, pursuant to a Department of Environmental Quality Air Permit. And, as of August 2008, the cost of the plant had approximately doubled as a result of the delay already caused by this litigation.

¶94 Thus, facing mounting costs and permit deadlines, and Plains Grains having failed to meet its obligations to seek a stay or injunction, SME commenced construction of the HGS, expending millions of dollars to develop the property—in accordance with its legal right to do so. This construction lawfully continues today, and there is simply no way to restore the parties to their original positions without substantial financial harm to Appellee SME. This Court can neither fashion any relief nor restore SME to its original, status quo position, as required under the principles of our mootness law. The Court does not even try to offer an explanation as to how SME can be returned to its status quo, because it simply cannot be done. Nor does the Court offer any explanation whatsoever about why it would issue strongly-worded dismissals of the appeals as mooted in *Turner*, *Henesh*, *Povsha*, and *Mills*, and many others, but simply ignore the law for Plains Grains. A fair application of the law cannot leave these cases standing side-by-side. At a minimum, the Court should take a

44

principled approach and explain that it has today determined to overturn our entire mootness jurisprudence.

¶95    *b.  Subsequent Legislative Enactment*

¶96    Plains Grains' appeal has also been rendered moot by Cascade County's subsequent adoption of a new county-wide zoning map and new county-wide zoning regulations. The Court attempts to avoid this additional mootness problem by emasculating *Country Highlands*. However, that case should be dispositive.

¶97    In *Country Highlands*, landowners brought suit against the Flathead County Board of Commissioners, alleging the County's amendments to its growth policy and the continuous rezoning of 215 acres of land, from "agricultural" to eventually "general business," were invalid. While the case was pending on appeal, Flathead County adopted a new growth policy and specifically incorporated the existing zoning districts. We held the landowners' appeal was moot because, even were we to strike down the zoning district amendments under the old Growth Policy, the County's new Growth Policy reenacted the zoning district amendments via incorporation and that action was presumed lawful and valid, absent another challenge. *Country Highlands*, ¶¶ 8, 13, 22 (citations omitted). We have recognized that adoption and revision of zoning regulations are legislative acts, entitled to presumptions of validity and reasonableness. *North 93 Neighbors, Inc. v. Bd. of Co. Commrs. of Flathead Co.*, 2006 MT 132, ¶ 18, 332 Mont. 327, 137 P.3d 557 (citing *Schanz v. City of Billings*, 182 Mont. 328, 335, 597 P.2d 67, 71 (1979)).

¶98    The Court offers that Cascade County's "2009 amendments to the CCZR changed nothing about the 668 acre rezone challenged by Plains Grains. The zoning designation and

45

map remain unchanged for the SME parcel, [and] [t]he area surrounding the SME parcel retains its A-2 'Agricultural' designation." Opinion, ¶ 31. The Court then concludes that the 2009 amendments "do not purport to repeal the earlier version of the CCZR," and minimizes the new ordinance as a "mere refinement." Opinion, ¶ 33.[6]

¶99     Giving the Court the benefit of the doubt, the Court may well have been hindered by the lack of a full record about this issue which results from the absence of a legal challenge to the new zoning ordinance. Nonetheless, the information provided to us by way of supplemental briefing demonstrates that the Cascade County Commissioners undertook an extensive, County-wide examination of the zoning districts and governing rules and regulations. In the spring of 2008, while this case was pending on appeal, Cascade County began the process of revising its County-wide regulations and zoning map to satisfy an exhaustive list of objectives, including:

- To update the regulations with current standard zoning language and practices;
- To update and refine definitions;
- To alter zoning districts and boundaries (See accompanying proposed zoning map.);
- To alter allowed uses in the various zoning districts;
- To zone all properties with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout Cascade County;
- To protect residential, business, commercial, and industrial areas alike from harmful encroachment by incompatible uses and to ensure that land allocated to a class of uses shall not be usurped by inappropriate uses;
- To avoid the inappropriate development of lands and provide for reduction of flood damage; . . .
- To foster a more rational pattern of relationship between residential, business, and industrial uses for the mutual benefit of all; [and]
- To isolate or control the location of unavoidable nuisance producing uses.

_____

[6] As with *Povsha*, the Court attempts to distinguish *Country Highlands* by quoting from the briefs in that case.

Ultimately, the County reduced the total number of zoning districts from 15 to 12, and established a new Multi-Use District. The County then provided the updated zoning map, along with corresponding identified uses, development standards and regulations for "each of these districts." Obvious from the materials, the County reexamined every zoning district in the entire County and adopted a new general zoning structure.

¶100   The Court attempts to distinguish *Country Highlands* on the ground that the County's "2009 amendments to the CCZR changed nothing about the 668 acre rezone challenged by Plains Grains." Opinion, ¶ 31. Of course they didn't; the County had just undergone a monumental effort to address that particular zone. Instead, the County revised *the entirety of the remaining areas* in the County, reducing the total number of zones from 15 to 12, and enacting new regulations. The rezoned parcel at issue in this case was thus placed within a completely new zoning context—surrounded by completely different zones with different regulations than when the current case was brought. The Court here completely misses the point: it has focused solely on the rezoned parcel without realizing that a spot zoning challenge requires an analysis of the surrounding zones as well. A new challenge providing a new record is required. This case is thus controlled by *Country Highlands*, and is rendered moot by Cascade County's subsequent legislative actions taken to institute a new county-wide zoning plan. This Court cannot provide effective relief. *Country Highlands*, ¶¶ 22-23. The Court's opinion is nothing more than an advisory opinion about the spot zoning issue as it existed under the former zoning plan, not the current one. Plains Grains must raise its spot zoning challenge under the new zoning structure.

¶101   In response to this issue, the Court attaches a map for the purpose of illustrating that, even after enactment of the 2009 Ordinance, the challenged zone is still a "black island of industrial land surrounded by a sea of green Agricultural land." Opinion, ¶ 33. I do not know why the Court would draw such a conclusion without benefit of a full record proving it, but the map is clearly misleading.   Within a few miles of the challenged zone is Malmstrom Air Force Base, visible from the property and including its own coal-fired heating plant, large hangars, facilities for storage of nuclear weapons and many large buildings.   To the northeast of the parcel is the MaltEuro malting barley plant, with numerous large concrete silos and large buildings.   The Great Falls switch yard for electrical transmission switching is just across the Missouri River and is also visible from the property. Within a few miles of the rezoned property are five hydroelectric dams on the Missouri River, as well as high capacity transmission lines, gas pipelines and related facilities, grain silos, elevators, rail lines and numerous other structures.   Yet, none of these are included in the Court's "sea of green" map, and the Court's reliance on it is flawed.   This illustrates the need for a proper record to be developed in response to a challenge to the new, county-wide ordinance—which Plains Grains, again, has failed to do.   While we have enough information to know that the zoning has changed, we do not have a full judicial record necessary to adjudicate the spot zoning issues under the new ordinance.   For that reason, *County Highlands* controls and this case is moot.

¶102 ***c.* Lohmeier v. State *and the Capable of Repetition yet Evading Review Exception to Mootness***

¶103 The Court makes two passing references to our decision in *Lohmeier v. State*, 2008 MT 307, 346 Mont. 23, 192 P.3d 1137, for the propositions that the spot zoning claim remains viable despite no stay or injunction, and that the transfer of property from the Urquharts to SME does not constitute a changed circumstance rendering Plains Grains' appeal moot. Opinion, ¶¶ 34, 51 (citing *Lohmeier*, ¶ 13). Briefly, it is well settled in our mootness jurisprudence that "[a] party may not claim an exception to the mootness doctrine where the case has become moot through that party's own failure to seek a stay of the judgment." *Turner*, 276 Mont. at 60, 915 P.2d at 803 (citing *Gates v. Deukmejian*, 987 F.2d 1392, 1408 (9th Cir. 1993)); *Billings High*, ¶¶ 14-18 (citations omitted). "Thus, where a party has failed to obtain–or at least attempt to obtain–a stay of proceedings pending appellate review, that party may not take advantage of the 'capable of repetition, yet evading review' exception to the mootness doctrine." *Billings High*, ¶ 18 (citing *Gates*, 987 F.2d at 1409).

¶104 ***3. The Court's Errors Regarding SME's Rights to Proceed from a Lawful Judgment and to Due Process of Law; The Court's Rejection of SME's Statements and its Criticisms of SME.***

¶105 In an apparent effort to shift the focus of this case from Plains Grains' failures, the Court conjures up a series of legal claims and aspersions to cast blame upon SME. The Court reasons that this case is not moot because "[i]t seems far from clear . . . that SME possessed the necessary permits that would have given it a legal right to develop the property . . . ." Opinion, ¶ 46. However, issues regarding what permits were necessary and whether

49

SME properly possessed them are not before this Court and, more importantly, it defies clear legal authority to suggest that SME could not proceed from the unstayed, legal judgment in its favor. *See* Rules of Civil Procedure: Title 25, chapter 9, MCA (Judgment); Title 25, chapter 13, MCA (Execution of Judgment); Title 25, chapter 20, part VII, MCA (Judgment). SME held this right regardless of whether it ultimately decided to change the design of its plant, discussed below. The effect of the Court's statements to the contrary—that a prevailing party must necessarily wait for the outcome of a possible appeal before acting upon a valid, lawful judgment—contradicts our statutory and procedural framework governing judgments and appeals. *See above-referenced statutes and rules of procedure, as well as* M. R. App. P. 22(1)(a)(i) and (iii) (Stay of Judgment or Order Pending Appeal).

¶106 This undermining of the right to proceed on a property judgment raises the issue of SME's constitutional right not to be deprived of its property without compensation or due process of law. Mont. Const. art. II, § 17; U.S. Const. amend. XIV, § 1. Plains Grains never requested, before the District Court or this Court, that SME's judgment be stayed or enjoined. Procedurally, SME never had notice or opportunity to present evidence in opposition to a stay or an injunction. Consequently, after obtaining a judgment, SME was entitled, as a matter of law, to proceed to develop its land pursuant to that judgment. The Court's decision today appears to take from SME the investment it has properly made in its property, without compensation or due process of law. *See Yellowstone Fed. Credit Union v. Daniels*, 2008 MT 111, ¶¶ 28-29, 342 Mont. 451, 181 P.3d 595 (recognizing fundamental rights and interests in property demand "punctilious compliance with all statutory and procedural requirements," requiring at least notice and a hearing; citations omitted); *In re*

*Best*, 2010 MT 59, ¶ 22, 355 Mont. 365, 229 P.3d 1201 ("due process requires a fair and impartial tribunal, *State v. Moore*, 268 Mont. 20, 51, 885 P.2d 457, 477 (1994), *overruled on other grounds*, *State v. Gollehon*, 274 Mont. 116, 906 P.2d 697 (1995), and a fair hearing, *Matter of Goldman*, 179 Mont. 526, 551, 588 P.2d 964, 978 (1978);" citations omitted).

¶107 As if in recognition of the wrong here done to SME, and in order to be able to excuse Plains Grains' failure to follow the appellate rules, the Court takes measures to make SME's expenditures in furtherance of its judgment "go away." It does so, first, by rejecting SME's explanation of its expenditures. It denies SME any relief for Plains Grains' failure to seek a stay because it "cannot determine from the record whether SME indeed has spent 'millions of dollars' to develop the property . . . ." Opinion, ¶¶ 48, 50. This begs the question—whose fault is that? Why doesn't this Court have a record about the precise amount SME has "indeed" spent on developing the property? The answer—because Plains Grains failed to follow the law and our Order. Consequently, a hearing wasn't held and the District Court did not enter an order setting forth the "findings of fact and conclusions of law, or a supporting rationale, that contains the relevant facts and legal authority," which we ordered. However, the Court concludes that it is somehow SME's fault because it "has adduced no evidence" and "failed to substantiate" its expenditures by an accounting, Opinion, ¶ 34, and failed to "substantiate with particularity" its losses, Opinion, ¶ 49, when any lack of evidence is only due to Plains Grains' failure to follow the law and our Order.

¶108 Every litigant who appears before this Court has an ethical duty of candor to the tribunal, and I see no reason to presume that SME has been untruthful to this Court about the money it has spent developing its land, particularly when the absence of evidence to the

51

contrary—the absence of a record—is not SME's fault. *See* Mont. R. Prof. Conduct 3.3(a)(1) ("A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;"). Plains Grains waived the right to make a record on this issue, but the Court is placing the financial consequence of Plains Grains' failure upon SME by rejecting its statements without a basis to do so.

¶109 But the Court goes further in casting blame upon SME. The statements made in ¶¶ 47-48 of the Opinion, detailing SME's missteps and setbacks in pursuing this project, have nothing to do with the issues before the Court—not even the issue of mootness. I can only surmise that they are made solely to discredit SME or the project. The Court subtly raises an issue not litigated by the parties—SME's consideration of changing the plant to a gas-fired design, Opinion, ¶ 48—to escape the effect of any expenditures SME has made pursuant to original design, a legitimate cost. The Court dismisses the sale of the land and the substantial sums expended thereon as irrelevant to mootness, when our cases show that these issues are directly relevant.

¶110 *4. Conclusion*

¶111 A summary of the Court's statements and decisions herein raises serious questions, in my view, about the disposition of this case. Consider the Court's:

> –Excusing Plains Grains' failure to follow appellate rules and procedures and our previous Order;
>
> –Rejecting application of our substantial mootness jurisprudence on the basis of an inappropriate distinguishment of a controlling case, *Povsha*;

–Deciding the validity of the zone without a challenge to, or a full judicial record about, a newly passed, county-wide zoning ordinance;

–Undermining the right of SME to proceed on a lawful, unstayed judgment;

–Requiring SME to bear the costs of its reliance upon the valid, unstayed judgment, in possible violation of its due process rights;

–Casting aspersions upon SME for irrelevant setbacks in the process of developing the project.

¶112 I do not understand the animus toward SME reflected in the Court's decision, and believe the Opinion stands in utter disregard to the law of appellate procedure, to the substantive law of judgments, and to our mootness jurisprudence. The Court has excused Plains Grains from compliance with the rules requiring a stay or injunction of the judgment to preserve the status quo of the parties, and then placed the consequences for that failure upon SME. Our long-established rules thus ring hollow, as their enforcement depends upon the Court's beck and call. And, in this case, the Court has gone both ways, first requiring precise enforcement of the rules, and then completely abandoning them. While "[a]n independent, fair, and impartial judiciary is indispensable to our system of justice," Mont. Code of Jud. Conduct preamble (2009), I believe SME has not been given justice here.

¶113 This appeal has been mooted in several different ways under very clear principles. I dissent and would dismiss the appeal.


/S/ JIM RICE


Justice James C. Nelson joins in the dissenting Opinion of Justice Rice.

53

/S/ JAMES C. NELSON

Justice Patricia Cotter joins in paragraphs 70-101 and 113 of the foregoing dissent.

/S/ PATRICIA COTTER