JUSTICE MORRIS
delivered the Opinion of the Court.
¶1 Plains Grains Limited Partnership (Plains Grains) appeals from an order of the Eighth Judicial District Court, Cascade County, granting summary judgment to the Board of Commissioners of Cascade County (County) and Southern Montana Electric (SME) and denying Plains Grains’ spot zoning claim. We reverse.
¶2 We review the following issues on appeal:
¶3 Did Cascade County’s adoption of a new county-wide zoning regulation in 2009 render moot Plains Grains’ spot zoning claim?
¶4 Did Plains Grains’ failure to seek a stay or injunction to prevent the sale or development of the land render moot its spot zoning claim?
¶5 Did the rezoning of 668 acres of land from Agricultural to Heavy Industrial constitute impermissible spot zoning?
FACTUAL AND PROCEDURAL BACKGROUND
I. The initial rezone
¶6 Duane and Mary E. Urquhart and Scott and Linda Urquhart (Urquharts) sought a zone change from Agricultural (A-2) to Heavy Industrial (1-2) for 668 acres of land in the northeast portion of Cascade County. The Urquharts submitted their rezoning application on October 30, 2007, to allow for the construction and operation of SME’s proposed coal-fired power plant, known as the Highwood Generating Station (HGS). SME changed its proposal for the HGS to a natural gas fired plant following the Department of Environmental Quality’s revocation of SME’s air quality permit. The Urquharts and SME participated jointly in the preparation of the application for rezoning. The Urquharts had agreed to sell the property to SME before the County approved the rezone.
¶7 The Urquharts’ rezone application claimed that “the requested zoning to heavy industrial use is a prerequisite to the planned construction and operation of an electric generating station.” The Cascade County Planning Department adopted and made public its initial Staff Report on November 19, 2007 (Staff Report). The Staff *65 Report described the surrounding land uses as agricultural for more than twenty acres in every direction. Approximately 200 acres of the land fell within the boundaries of the Lewis and Clark Great Falls Portage National Historic Landmark. The Staff Report cited the Urquharts’ attempt to “take advantage of the Tax Increment Financing mechanisms provided in state statutes” as the primary reason that the Urquharts had requested rezoning.
¶8 The Staff Report acknowledged that the construction and operation of the HGS would be “out of character with the existing agricultural land uses in the vicinity of the proposed rezoning.” The Staff Report noted, however, that construction and operation of the HGS would not necessarily be “out of character with the land uses allowed under the existing A-2 zoning district.” (Emphasis added). The Staff Report based this conclusion on the fact that the A-2 zone permitted electrical generation facilities through the special use permit process. As a result, the Staff Report determined that “the rezoning is not necessary to accommodate the HGS facility, as such a use is permissible with a special use permit.” The Staff Report further noted that the actual construction of any structures or development of the property would require a zoning location-conformance permit.
¶9 SME submitted a letter on January 9, 2008, in response to the Staff Report and the Planning Board’s report to the Commissioners. SME’s letter contained eleven proposed “conditions” that were intended to address the Planning Board’s comments. The SME letter contained, in pertinent part, an agreement by SME that “as a condition of rezoning to heavy industrial use, such use shall be solely for purposes of an electrical power plant.”
¶10 Plains Grains claims to have been unaware of the SME letter until the Commission’s public hearing on the proposed rezone on January 15, 2008. SME submitted an array of documentation at the public hearing, including a traffic impact study, a baseline noise study, a report on the health impacts of coal-fired power plants, a property appraisal report, and a landscape plan. The County adopted a resolution of intent on January 31, 2008, to rezone the Urquharts’ property.
¶11 The resolution of intent incorporated by reference the eleven conditions offered in SME’s letter. The County published notice of the resolution on four dates over the course of two weeks in February of 2008. The Commissioners met on March 11, 2008, to consider Final Resolution 08-22 to rezone the Urquharts’ property from A-2 to 1-2. The Commissioners adopted the Planning Board’s report as their findings on the proposed rezone. More than 1900 citizens submitted *66 comments on the proposed rezone. The Commission approved the motion to rezone.
II. District Court Proceedings
¶12 Plains Grains filed a complaint on April 10, 2008. Plains Grains requested that the court set aside the County’s approval of the rezone and requested that the court issue a writ of mandate, a writ of review before this Court, and a declaratory judgment. Plains Grains claimed first that the adoption of the zone change constituted “conditional zoning” and violated the Zoning Enabling Act and statutory and constitutional public notice and participation requirements. Plains Grains also alleged that the zone change constituted impermissible spot zoning. SME and the Urquharts intervened on May 1, 2008. The County and SME responded to Plains Grains complaint with motions for summary judgment that the sale of the property by the Urquharts to SME on August 25, 2008, had rendered moot both issues. The County filed a separate motion for summary judgment on September 20, 2008. Both parties engaged in extensive pretrial litigation.
¶13 The District Court issued its order on November 28, 2008. The court first addressed the County’s motion for summary judgment as to mootness. The court rejected the County’s argument that a favorable decision could not return Plains Grains to the status quo. The court recognized that “the underlying status quo is not property ownership but the re-zoning determination by the Cascade County Commissioners. That is not moot for either Defendant SME or any of the Plaintiffs.” The District Court also rejected the County’s argument that Plains Grains should have obtained a stay in order to preserve its claim.
¶14 The District Court denied Plains Grains’ motion for summary judgment and its application for writs of mandate and review. The court found first that the eleven allegedly improper conditions constituted merely an adoption of the Planning Board’s suggestions and findings. The court rejected Plains Grains’ public participation claims after it determined that the County had satisfied the notice and public participation requirements of both the Montana constitution and statutory provisions. Finally, the District Court denied Plains Grains’ spot zoning claim on the basis that the rezone did not satisfy the three-part test for impermissible spot zoning articulated by this Court in Little v. Board of County Comm’rs, 193 Mont. 334, 346, 631 P.2d 1282, 1289 (1981).
¶15 SME and the Urquharts filed a motion for entry of judgment on January 7, 2009. Plains Grains opposed the motion on the grounds that the District Court’s rejection of Plains Grains’ motion for *67 summary judgment did not represent a final resolution on the merits. Plains Grains filed a petition for a writ of supervisory control with this Court shortly thereafter. SME opposed the exercise of supervisory control in light of the District Court’s denial of Plains Grains’ requested relief.
¶16 This Court granted limited supervisory control on April 29,2009. We directed the District Court to resolve any remaining claims and to issue a final judgment from which Plains Grains could appeal. Our Order delineated the procedure for requesting a stay or injunction pending appeal should Plains Grains choose to exercise that option. The Order did not affirmatively instruct Plains Grains to file a stay or injunction pending appeal.
¶17 The District Court issued its final order and judgment on May 27, 2009. The court denied summary judgment to Plains Grains on all claims and granted the County summary judgment on the merits. Plains Grains filed its notice of appeal with this Court on June 1,2009. Plains Grains raised on appeal its conditional zoning, spot zoning, and public participation claims. The County filed its cross-appeal on June 11, 2009. The County and SME claimed, as they did in the District Court, that the transfer of the property from the Urquharts to SME had rendered moot Plains Grains’ claims.
III. The 2009 zoning ordinance
¶18 On August 25, 2009, while this case was pending on appeal, the Cascade County Commission voted to approve amendments to Sections 1 through 5 and 7 through 16 of the Cascade County Zoning Regulations (CCZR) and zoning map. The Planning Board cited the need to update the regulations and definitions and to alter certain zoning districts and boundaries. The 2009 amendments reflected the County’s desire to update zoning definitions and to clarify regulations dealing with “hoofed animals” on residential lots and setbacks for wind turbines, among other matters. The amendments did not change or modify the 1-2 Heavy Industrial designation created by the 2008 rezoning of the SME property. The amendments likewise did not change the zoning of any of the surrounding land. The SME property retains its 1-2 designation (Heavy Industrial) implemented by the 2008 rezone at issue here. The surrounding land continues to be zoned Agricultural.
¶19 The County inexplicably waited until six days before the scheduled oral argument to file a notice of supplemental authority with this Court. The County represented that the 2009 version of the CCZR had replaced the zoning regulations in effect at the time of the District Court’s November 28,2008, order. The County claimed at oral *68 argument that the new version of the CCZR superseded the version in place at the time of the 2008 contested rezone. The County argued that these amendments ratified the 2008 rezone and therefore mooted Plains Grains’ challenges to the 2008 rezone. This Court ordered supplemental briefs from both parties as to what effect the County’s adoption of the 2009 CCZR amendments had on Plains Grains’ claims. ¶20 SME separately filed a motion to dismiss on grounds of mootness on August 25, 2009. SME claimed that it had invested “millions of dollars in site work, development of water sources, purchasing and securing space on the transmission network and commencing construction of certain concrete and steel foundation structures” after its purchase of the property. SME claimed that, having undertaken these activities, it could no longer be restored to its original position. SME filed a second motion to dismiss on grounds of mootness on April 9, 2010. SME based this second motion to dismiss on Plains Grains’ failure to appeal the August 2009 amendments to the CCZR by the March 1, 2010, deadline. SME argued that the August 2009 amendments had rendered moot Plains Grains spot zoning claim. We address each of SME’s motions in due course.
STANDARD OF REVIEW
¶21 We review de novo a district court’s grant or denial of a motion for summary judgment. State v. Butte-Silver Bow County, 2009 MT 414, ¶ 17, 353 Mont. 497, 220 P.3d 1115. A district court’s grant or denial of a writ of mandate constitutes a conclusion of law. We review for correctness a district court’s conclusions of law. Belgrade Educ. Ass’n v. Belgrade Sch. Dist. No. 44, 2004 MT 318, ¶ 6, 324 Mont. 50, 102 P.3d 517. Zoning designations are legislative acts that courts review for an abuse of discretion. North 93 Neighbors Inc. v. Bd. of Co. Comm’rs, 2006 MT 132, ¶ 18, 332 Mont. 327, 137 P.3d 557.
DISCUSSION
¶22 Did Cascade County’s adoption of a new county-wide zoning regulation in 2009 render moot Plains Grains’ spot zoning claim?
¶23 The County and SME argue that the 2009 amendments to the CCZR render moot Plains Grains’ challenges to the 2008 rezone of the SME property. A matter becomes moot when the legal issue presented to a court ceases to exist. Lohmeier v. State, 2008 MT 307, ¶ 13, 346 Mont. 23, 192 P.3d 1137. The County relies primarily on our decision in Country Highlands Homeowners Ass’n v. Bd. of County Comm’rs, 2008 MT 286, 345 Mont. 379, 191 P.3d 424, for the proposition that the *69 2009 amendments to the CCZR render moot the 2008 zone change. We examine the circumstances of Country Highlands to test this theory. ¶24 The landowner in Country Highlands initially had sought a zone change from agricultural to suburban-agricultural. The board of county commissioners approved the zone change (2003 rezone). Id. at ¶ 9. An association of neighboring landowners challenged the county’s approval of the 2003 rezone. Id. at ¶ 12. The landowner acquired another plot of land contiguous to the original acreage after the county had approved the 2003 rezone.
¶25 The landowner then petitioned the county for an amendment to the 1987 growth policy. The landowner sought a revision that would have allowed for a mixed-use planned unit development on the entire parcel, including that portion acquired after the 2003 rezone. The board of county commissioners approved the growth policy amendment (2004 amendment). Id. at ¶ 10. The landowner then sought to rezone the entire parcel from suburban-agricultural and agricultural to residential and business. The county again approved the zone change (2005 rezone). Id. at ¶ 11.
¶26 These actions prompted the neighbors to file an amended complaint in which they challenged both the 2004 amendment to the growth policy and the 2005 rezone. Id. at ¶ 12. The county adopted a new growth policy (2007 growth policy) while the case was pending on appeal. Id. at ¶ 13. The 2007 growth policy represented “a wholesale change from the 1987 Growth Policy,” not a “mere refinement of the earlier document.” Br. of Appellees at 12, Country Highlands Homeowners Ass’n v. Bd. of County Comm’rs, http://fnweb1.isd. doa.state.mt.us/idmws/custom/sll/sll_fn_home.htm (No. DA 06-0679, 2008 MT 286, 345 Mont. 379, 191 P.3d 424). The 2007 growth policy reflected significant demographic and land use changes that had occurred in the area in the twenty years since the 1987 growth policy had been adopted. Country Highlands, ¶ 13. These changes specifically included increased density and a change from agricultural to commercial and residential uses for the land that was the subject of the neighbors’ suit.
¶27 We agreed with the county that its adoption of the 2007 growth policy had repealed and replaced the 1987 growth policy. The repeal of the earlier growth policy had rendered moot the issues raised by the neighbors. Id. at ¶ 16. The neighbors had requested that the Court “invalidate the 2004 Growth Policy amendment on the basis that it was inconsistent with the 1987 Growth Policy and then invalidate the 2005 Zoning District amendment because it was based on the flawed 2004 Growth Policy Amendment.” Id. at ¶ 19. We recognized that this *70 relief would not restore the neighbors to their original position. The 2005 rezone would continue to exist and be presumed valid under the 2007 growth policy. A challenge by a party still would be needed to determine whether the 2005 rezone “was consistent with the 2007 Growth Policy, which has superseded the 1987 Growth Policy.” Id. at ¶ 22. We were unable to provide an effective remedy to the neighbors because “[t]he issue of whether the 2005 Zoning District amendment is consistent with the current 2007 Growth Policy is not before us for consideration.” Id. The neighbors still would have needed to challenge the 2005 rezone under the new 2007 growth policy in order to obtain the relief that they had requested.
¶28 Country Highlands does not stand for the proposition that a generalized zoning amendment that changes nothing about a disputed land use decision automatically ratifies such a decision. Country Highlands instead recognizes that subsequent legislative actions that effectively repeal an earlier legislative action may impede the ability of a court to provide meaningful relief to a party that has challenged the legality of the earlier legislative action. Id. at ¶ 22. Moreover, Country Highlands involved an entirely new growth policy that constituted a “wholesale change” from the old growth policy. This new growth policy incorporated explicitly the challenged zoning amendments. The neighbors had based their claim solely upon the fact that the zoning amendments allegedly conflicted with the repealed growth policy. Id. The County’s adoption of an entirely new growth policy that was presumptively consistent with the challenged zoning rendered moot the neighbors’ claim.
¶29 Plains Grains, by contrast, did not challenge the 2008 rezone based on non-compliance with the growth policy. Plains Grains challenged as impermissible spot zoning the legislative act that created the 1-2 Heavy Industrial zone on the Urquhart/SME property. The 2009 amendments to the CCZR had no effect on the zoning designation of the SME property or that of the surrounding agricultural zoned land. The 2009 amendments focus on issues unrelated to the 2008 rezone, including changes to regulations dealing with “hoofed animals” on residential lots and setbacks for wind turbines. Nothing in the County’s documentation or the public comment surrounding the 2009 amendments mentions the zoning of SME’s parcel or of any of the surrounding land. No “wholesale change” in either the growth policy or the surrounding zoning has repealed or superseded the County’s 2008 decision to rezone the SME parcel. Nothing in our decision in Country Highlands precludes our consideration of Plains Grains’ spot zoning claim.
*71 ¶30 SME argues in its second motion to dismiss that Plains Grains’ failure to appeal the August 2009 amendments likewise rendered moot Plains Grains’ spot zoning claim. SME cites specifically to the six-month statute of limitations for challenges to the “creation of a zoning district or adoption of zoning regulations” set forth in § 76-2-202(l)(b), MCA. Plains Grains timely challenged, however, the creation of the 668 acre 1-2 zoning district in 2008.
¶31 Nothing about the challenged 2008 rezone depends on the growth policy or on an outdated version of the CCZR. The 2009 amendments to the CCZR changed nothing about the 668 acre rezone challenged by Plains Grains. The zoning designation and map remain unchanged for the SME parcel. The area surrounding the SME parcel retains its Agricultural designation. Plains Grains’ spot zoning claim thus does not rely on the invalidity of an earlier legislative enactment that now has been superseded or repealed.
¶32 The Dissent takes the Court to task for failing to analyze the effect of the 2009 amendments on the zones surrounding the SME parcels. We do not dispute that our spot zoning analysis requires us to look at both the challenged parcel and the surrounding zones. We are unable to discern the basis for the Dissent’s claim, however, that “[t]he rezoned parcel at issue in this case was thus placed within a completely new zoning context.” Dissent, ¶ 100. Plains Grains pointed out in its supplemental brief that the Cascade County Planning Board’s amended zoning map for the relevant parcels reflects identical zoning designations to those that existed before the challenged rezone. This map, included in the record and reproduced below, reveals the same “sea” of Agricultural zoned land surrounding the 668 acre parcel of Heavy Industrial zoned land that existed before the 2009 amendments to the CCZR. More importantly, the land zoned Agricultural retains the same designation that it held before the 2009 amendments. As required by Little, we have analyzed both the challenged parcel and the surrounding zones. Little, 193 Mont. at 346, 631 P.2d at 1289. The fact that both SME’s property and the surrounding zones retain their original designations under the new zoning ordinance supports our determination to evaluate whether the County engaged in impermissible spot zoning with respect to the 668 acre rezone notwithstanding the unrelated amendments to the CCZR adopted by the County in 2009.
*72 [[Image here]]
¶33 The 2009 amendments, moreover, do not purport to repeal the earlier version of the CCZR. The 2009 amendments to the CCZR represent merely a refinement of the previous version of the CCZR. The CCZR revisions sought to update the regulations, definitions, and certain zoning district boundaries and permitted land uses. The Dissent stresses that the County has reduced the total number of zones from 15 to 12. None of the zones combined with others by the County as part of the 2009 amendments in any way affected the zoning designations of either the SME parcel or the surrounding property. For example, the 2009 amendments added a new “multi-use” district *73 adjacent to the Great Falls city limits, modified regulations for alternative energy production, and allowed for smaller lot sizes near the city of Great Falls. The 2009 amendments had no effect on the land use classifications challenged by Plains Grains. The County acknowledged as much in its notice of supplemental authority before this Court. The County noted that “the parcels at issue in this matter remained the same.” Plains Grains points out that the old zoning map and the amended zoning map depict the parcels at issue in an identical manner: a “black island of Industrial land surrounded by a sea of green Agricultural land.”
¶34 It is axiomatic that a court must be able to grant meaningful relief or restore the parties to their original position. Powder River County v. State, 2002 MT 259, ¶ 101, 312 Mont. 198, 60 P.3d 357. The 2009 amendments to the CCZR do not preclude a court from ruling on the legality of the 2008 rezone of the Urquhart/SME property. The question of the legality of the 2008 rezone remains alive. Lohmeier, ¶ 13. A remedy exists in light of the fact that a favorable ruling would restore Plains Grains to its original position-the 668 acres at issue would revert to its original Agricultural designation. SME, by contrast, has adduced no quantifiable evidence to support its argument that Plains Grains’ claim is moot. SME claims that the delays caused by this litigation have cost it millions of dollars. SME has failed to substantiate its mootness claim in the record presented to this Court, however, by any accounting-or even a numeric estimate-of the losses it claims to have suffered. In the absence of such information, we are unable to determine SME’s pre-rezone “status-quo.” Powder River, ¶ 101. Consequently, we cannot determine whether SME’s alleged expenditure of millions of dollars has rendered moot Plains Grains’ claim based on the record before us.
¶35 Did Plains Grains’ failure to seek a stay or injunction to prevent the sale or development of the land render moot its spot zoning claim ?
¶36 SME claims that the sale of the land by the Urquharts to SME rendered moot Plains Grains’ spot zoning, conditional zoning, and public participation claims. SME argues that Plains Grains’ failure to request a stay of the rezoning or the sale of the property now prevents it from raising these issues on appeal. See e.g. Charlotte Mills, Clerk & Recorder v. Alta Vista Ranch, LLC, 2008 MT 214, 344 Mont. 212, 187 P.3d 627. SME argues that our case law supports the proposition that a party’s failure to seek a stay proves fatal to a litigant’s case where the property has changed hands. SME predicates this claim on the argument that the transfer of property from the Urquharts to SME precludes the District Court from returning the parties to the status *74 quo. SME further argues that the “millions of dollars” it has expended, combined with the procedural burden of obtaining “numerous permits,” further renders impossible our ability to return SME to its status quo.
¶37 We first must address the Dissent’s assertion that our Order in response to Plains Grains’ petition for writ of supervisory control required Plains Grains to obtain a stay or injunction pending appeal. Our Order directed the District Court to issue a final judgment on all claims so that Plains Grains could seek review from this Court through the appeal process. The Order laid out the procedural requirements that Plains Grains would need to fulfill in order to seek a stay or an injunction pending appeal should it choose to do so. The Order did not direct affirmatively that Plains Grains seek a stay or an injunction pending appeal. The Dissent claims that those advisory instructions render our Order the law of the case with regard to Plains Grains’ failure to seek a stay or an injunction pending appeal. The Dissent misconstrues our law of the case precedent.
¶38 The Dissent cites a litany of cases for the proposition that “the decision, judgment, opinion or rulings on former appeal or writ of error become ‘law of the case.’ ” Dissent, ¶ 74, quoting Fiscus v. Beartooth Elec. Coop., 180 Mont. 434, 436, 591 P.2d 196, 197 (1979). The Dissent likens our Order on Plains Grains’ petition for writ of supervisory control to an order on a “former appeal or writ of error.” We did not state in the Order “a principle or rule of law necessary to the decision” affirmatively directing Plains Grains to seek a stay. Carlson v. Northern Pac. Ry., 86 Mont. 78, 81, 281 P. 913, 914 (1929). We instructed the District Court to resolve any remaining claims and issue a final judgment. We observed that Plains Grains could then “decide whether to appeal and whether to seek a stay of the District Court’s final judgment or an injunction pending appeal.” Order Granting Pet. For Writ of Supervisory Control, Plains Grains v. Eighth Jud. Dist., 5 (April 29, 2009) (OP 09-0054) (emphasis added). Our comments regarding the proper procedure for Plains Grains to follow in seeking a stay or injunction, should it choose to do so, do not constitute “a final adjudication” under Carlson.
¶39 The Dissent’s attempt to equate Plains Grains’ situation with that in Murphy Homes, Inc. v. Muller, 2007 MT 140, 337 Mont. 411, 162 P.3d 106, likewise falls short. Appellants sought emergency review of the district court’s decision to bifurcate the trial and asked this Court to vacate upcoming trial dates. Id. at ¶ 50. We initially granted the petition and issued an order requiring the district court to give the parties at least 30 days notice before scheduling a trial date. Id. at ¶ 51. We amended our order to require the district court to provide *75 “reasonable notice” to the parties, however, following numerous unsuccessful attempts by the district court to comply with our order and dilatory tactics by the appellants. Id. at ¶ 53. Appellants argued on appeal that the lengthy interval between the bifurcated trial dates had prejudiced their cause. Id. at ¶ 55. We refused to address on appeal whether the District Court properly had bifurcated the trial in light of appellant’s dilatory tactics and the district court’s good faith efforts to comply with our order. We instead determined that the matter had “already been decided by this Court and may not be relitigated.” Id. at ¶ 56.
¶40 Our Order on Plains Grains’ request for writ of supervisory control presents no equivalent situation. Unlike in Murphy, we did not render a decision on the issue of whether Plains Grains had to seek a stay or injunction pending appeal. Our direction to the District Court to resolve any remaining claims and to issue a final judgment from which Plains Grains could appeal represented the only final decision provided by the Order. We made no decision on which path Plains Grains had to pursue following the District Court’s resolution of any remaining claims and its issuance of a final judgment. This decision remained one for Plains Grains to make. Plains Grains opted for a path fraught with risk to its appeal. This risky decision by Plains Grains in no way violated, however, any “final adjudication” on any issue by this Court. Carlson, 86 Mont. at 82, 281 P. at 914. Our Order presents no “law of the case” roadblock to Plains Grains’ pursuit of its appeal.
¶41 We next consider the Urquharts’ sale of the land to SME. The District Court observed, with regard to the transfer of the property from the Urquharts to SME, that “the underlying status quo is not property ownership but the re-zoning determination by the Cascade County Commissioners.” The decisions of this Court cited by SME are distinguishable from the sale of the property by the Urquharts to SME. Turner v. Mountain Eng’g. & Constr., 276 Mont. 55, 915 P.2d 799 (1996); Henesh v. Bd. of Comm’rs., 2007 MT 335, 340 Mont. 239, 173 P.3d 1188; Povsha v. City of Billings, 2007 MT 353, 340 Mont. 346, 174 P.3d 515; Mills, 2008 MT 214, 344 Mont. 212, 187 P.3d 627.
¶42 The transfer of the property to a third party in each of these cases rendered moot the plaintiffs claim because the transfer of the property prevented the court from restoring the plaintiff to his original position. The subsequent valid sale of individual lots to bona fide third party buyers represented a “changed circumstance” that rendered moot the plaintiffs challenge to the subdivision as a whole. See e.g. Povsha, ¶ 19. The court in those cases faced a situation in which it no longer was *76 able to grant plaintiffs’ requested relief without implicating the validity of the third-party sales. Id. Though the parties to the suit had not changed, the sales also had the effect of fundamentally changing the character of the underlying land. The sale of lots in a subdivision inalterably modifies the single plot of land that had formed the basis of the plaintiffs’ suit. A court’s determination that the local governing body improperly approved a subdivision cannot return the parcel to its original configuration once lots have been sold to third parties. The challenging party cannot be restored to its pre-sale status quo by a decision invalidating the action of the governing body. Id. at ¶ 23.
¶43 The effect of the sale from the Urquharts to SME presents no similar barrier to a court’s ability to provide relief. SME purchased the same 668 acre parcel for which the Urquharts sought the zone change. The 668 acre parcel remains intact. The sale from the Urquharts to SME did not alter the property’s legal identity. A decision by the court to invalidate the zone change simply would modify the zoning designation attached to that same 668 acre parcel. The Urquharts’ application for rezoning referred to the planned sale to SME. A decision by a court to invalidate the zone change would not implicate the validity of the sale from the Urquharts to SME.
¶44 The Dissent contends that “Povsha is so squarely on point that it cannot be distinguished in good faith.” Dissent, ¶ 86. We disagree. Povsha sought to enjoin a zoning change that would facilitate a commercial development on land that had been zoned for residential purposes. The commercial development was to house a wholesale automobile auction site. Povsha applied for a preliminary injunction on May 22, 2002, to prevent the construction of the commercial development. Povsha, ¶ 11. The district court denied Povsha’s application on June 18, 2002, and he did not appeal. Povsha, ¶ 11.
¶45 Povsha continued to litigate the merits of his spot zoning claim while the commercial development proceeded apace. The district court eventually rejected Povsha’s spot zoning claim nearly four years later on February 14, 2006. Povsha, ¶ 16. The developer had completed construction of the wholesale automobile auction site during the four years between Povsha’s filing for a preliminary injunction in 2002 and the district court’s denial of Povsha’s spot zoning claim in 2006. The auction site had been operating with its “emissions and noise from the idling diesel engines of semi-trucks making deliveries; the sight of countless parked vehicles, and the glare of the facility's lighting which remained on throughout the night.” Br. of Appellant at 15, Povsha v. City of Billings, http://fnweb1.isd.doa.state.mt.us/idmws/custom/sll/sll_fn_home.htm (No. DA 06-0204, 2007 MT 353, 340 Mont. *77 346, 174 P.3d 515). The original owner had gone out of business by 2004 and had sold the facility to a new owner who had continued to operate the auction site up through the time of Povsha’s appeal. Povsha conceded on appeal “that for all intents and purposes, the damage in this case has already been done.” Povsha, ¶ 18.
¶46 The “damage” that Plains Grains seeks to avoid has not already been done. Plains Grains seeks to prevent the construction and operation of a large industrial facility on land that previously had been zoned for agricultural purposes. The Dissent suggests that SME has obtained numerous permits at substantial cost that it needed “in order to commence construction of the HGS.” Dissent, ¶ 93. The Dissent further argues that SME has commenced construction of the HGS, “expending millions of dollars to develop the property - in accordance with its legal right to do so.” Dissent, ¶ 94. It seems far from clear, however, that SME possessed the necessary permits that would have given it a legal right to develop the property or that the procedural burdens it cites remain relevant to its current proposal for a natural gas fired power plant.
¶47 SME initially commenced construction in the form of earthmoving and site preparation for a proposed coal fired power plant. SME never obtained financing for the actual construction of its proposed coal fired power plant. More importantly, DEQ forced SME to halt its premature earthmoving and site preparation due to the fact that SME had not yet obtained a permit for this activity. DEQ issued a Notice of Violation to SME. SME eventually requested that DEQ revoke its air quality permit to construct the coal fired power plant when it failed to secure funding for the plant. SME’s request for a change from a coal fired plant to a gas fired plant relates to any inquiry as to SME’s pre-rezone “status quo.”
¶48 We cannot determine from the record whether SME indeed has spent “millions of dollars” to develop the property for a gas powered facility. Moreover, SME had not yet obtained its final air quality permit that would allow it to construct the proposed HGS at the time that the parties submitted their briefs on appeal. The County estimates that SME has expended “approximately $40 million” in the purchase and development of the 668 acre parcel. SME acted as a party to the proposed zone change from the outset. The sale of the property from the Urquharts to SME did not render moot Plains Grains’ spot zoning claim. It would be inappropriate to include as part of our mootness analysis the purchase price in the millions of dollars allegedly expended by SME.
*78 ¶49 The District Court earlier had rejected a similar claim on the basis that the zoning designation, rather than the property ownership, represents the “underlying status quo.” Mootness revolves around a court’s ability to restore the parties to their original position. Powder River County, ¶ 101. Plains Grains easily could have found themselves in a position similar to the neighboring landowner in Povsha. The completion and operation of the HGS would have eliminated this Court’s ability to provide relief to Plains Grains. Povsha, ¶ 23. SME makes no such claim on appeal. SME likewise does not substantiate with particularity its claim that it had spent millions of dollars during the pendency of this litigation. SME instead contends that the millions of dollars that it has expended in preparing the site for construction deprives this Court of the ability to return it to the status quo. We cannot evaluate the accuracy of SME’s generalized claim that it has expended “millions of dollars” in preparing the site for construction based on the record presented on appeal. It is well established that we must confine our review to the record. Federated Mut. Ins. Co. v. Anderson, 277 Mont. 134, 138, 920 P.2d 97, 100 (1996). Similarly, SME’s alleged expenditure of millions of dollars does not constitute a fact of which this Court can take judicial notice. M. R. Evid. 201; In re S.T., 2008 MT 19, ¶ 17, 341 Mont. 176, 176 P.3d 1054. As a result, we cannot conclude based on the record presented on appeal that SME’s alleged expenditure of millions of dollars has rendered moot Plains Grains’ spot zoning claim.
¶50 We agree with the District Court that the “underlying status quo” involves the zoning designation and not property ownership. The transfer of the property from the Urquharts to SME does not constitute a changed circumstance that moots Plains Grains’ claims. Lohmeier, ¶ 13. SME does not stand in the shoes of a third party buyer in the same sense as the bona fide purchaser of property at a sheriffs sale (Turner), or the bona fide purchaser of a lot in a subdivision (Henesh,Povsha, and Mills). SME stands in the shoes of the Urquharts as petitioner for the zone change. Plains Grains’ spot zoning claim survives the sale of the property from the Urquharts to SME.
¶51 Did the rezoning of 668 acres of land from Agricultural to Heavy Industrial constitute impermissible spot zoning?
¶52 Plains Grains claims that the rezoning of 668 acres of land from agricultural to heavy industrial constitutes impermissible spot zoning. The County and SME counter that the construction of the HGS did not require rezoning. The District Court determined that Plains Grains could not satisfy the Little test based on its determination that SME could construct the HGS through the special use permit process *79 without obtaining a zone change. The District Court acknowledged that important indicators of spot zoning were present. The District Court placed greater weight, however, on two internal planning staff reports that concluded that the HGS would have been allowed within the existing Agricultural zoning district with a special use permit. As a result, the District Court determined that conversion from agricultural to industrial use would not constitute a significantly different use from those prevailing in the area.
¶53 Plains Grains argues that the District Court incorrectly conflated activities allowed “as of right” in a given zone with those allowed only under a special use permit. Plains Grains argues that a fundamental difference exists between the administrative procedures involved in obtaining a special use permit and the quasi-legislative process required for a zone change. A party must seek a special use permit from the board of adjustment, an administrative body appointed by the county commission, an elected body. Section 76-2-221, MCA. The county commission itself must approve a zone change. Section 76-2-205(6), MCA.
¶54 We need not determine definitively whether SME could have obtained a special use permit to build the generating station. The District Court’s determination that the HGS would have been allowed under a special use permit implies that the issuance of a special use permit constitutes a ministerial act over which the board exercises no discretion. Beasley v. Flathead County Bd. of Adjustments, 2009 MT 120, ¶ 17, 350 Mont. 171, 205 P.3d 812. The board of adjustment exercises considerable discretion, however, with respect to whether to grant a special use permit. Section 76-2-223, MCA; See also Beasley, ¶ 18. For instance, a property owner in Beasley sought a writ of mandate to compel the board of adjustment to grant the transfer of a conditional use permit (CUP) obtained by the previous owners. The CUP would have allowed the property owner to operate a gravel pit. We denied the request on the grounds that a writ of mandate cannot be used to compel a discretionary act. Beasley, ¶ 18.
¶55 SME likely would face more than a mere ministerial act in seeking to obtain a special use permit to construct the HGS. Section 8 of the Cascade County Zoning Regulations provide that a “special use is a use for which conformance to additional standards will be required and shall be deemed to be a permitted use in its respective district.” Section 8 enumerates the procedural requirements to obtain a special use permit. These requirements include the submission of a site plan, public notice, and a hearing process.
*80 ¶56 The Board may not issue a special use permit unless it first makes five required findings. These findings include that the proposed development will not “materially endanger” the public health, safety, or welfare; that the development will not harm surrounding property values unless it is deemed to be a public necessity; and that the development will be “in harmony” with the area in which it is to be located. The petitioner bears the burden of presenting sufficient evidence to allow the board to make each of the required findings. Nothing in the CCZR compels the Board to issue a special use permit once it makes the required findings. This fact suggests that the granting of a special use permit is a discretionary act.
¶57 SME cited the rezone as a “prerequesite” to building the HGS in its petition for rezoning. SME arguably had two procedural paths open to it. Both paths required public notice, a hearing, and a comprehensive application process. SME opted for rezoning because it wished simultaneously to create a tax increment financing district to help finance the HGS. The rezone became truly a “prerequisite” to building the HGS once SME elected to proceed down the quasi-legislative path of a rezone application. The District Court improperly concluded that the availability of the special use permit option rendered unnecessary SME’s zone change request even though SME elected to pursue rezoning rather than seeking to obtain a special use permit. The fact that SME arguably could have pursued a special use permit does not undermine Plains Grains’ spot zoning claim.
¶58 We turn then to the merits of Plains Grains’ spot zoning claim. Whether impermissible spot zoning has occurred presents a fact-specific inquiry that will vary from one case to the next. Little, 193 Mont. 334, 346, 631 P.2d 1282, 1289. The presence of three conditions generally will indicate, however, that a given situation constitutes spot zoning, regardless of variations in factual scenarios. Id.
¶59 The first prong of the three-part Little test examines whether the requested use would differ significantly from the prevailing land uses in the area. Id. The second prong explores whether the area requested for the rezone would be “rather small” in terms of the number of landowners benefitted by the requested zone change. Id. Finally, the third prong analyzes whether the requested zone change would be in the nature of “special legislation” designed to benefit one or a few landowners at the expense of the surrounding landowners or the public. Id. A court must analyze the second and third prongs of the Little test in concert. Boland v. City of Great Falls, 275 Mont. 128, 134, 910 P.2d 890, 894 (1996). The number of landowners benefitted by the zone change speaks directly to the issue of whether the requested *81 change constitutes special legislation in favor of one or a small number of landowners. Id.
¶60 We first must determine “whether the requested use differs from the prevailing use in the area.” North 93 Neighbors, Inc. v. Bd. of County Comm’rs, 2006 MT 132, ¶ 65, 332 Mont. 327, 137 P.3d 557 (citing Little, 193 Mont. at 346, 631 P.2d at 1289). The District Court acknowledged that there “unquestionably” would be a change from the current agricultural use to the proposed heavy industrial use represented by the HGS. The County cites North 93 Neighbors for the proposition that a court applying the first prong of the Little test may look to the land uses allowed under current zoning rather than the prevailing uses in the area. We analyzed the land uses allowed by current zoning in North 93 Neighbors only after we thoroughly had considered the existing uses in the area. Our conclusion that the prevailing uses were not significantly different from the proposed use was based on our consideration of both the prevailing uses and the uses allowed by current zoning. Id. Thus a court may consider the existing zoning in addition to prevailing uses. Nothing in North 93 Neighbors directs a court to consider what uses would be available under existing zoning in lieu of prevailing uses, as the County suggests.
¶61 We further distinguish North 93 Neighbors from the instant facts in that the proposed rezone in that case would have constituted merely an extension of existing zoning. We observed in North 93 Neighbors that “[extending a preexisting zone classification to include a larger area does not constitute spot zoning.”North 93 Neighbors, ¶ 67 (citing State ex rel. Gutkoski v. Langhor, 160 Mont. 351, 353, 502 P.2d 1144, 1146 (1972)). By contrast, the proposed rezone to facilitate construction of the HGS would create an island of heavy industrial zoning within a large area zoned for agricultural use.
¶62 Finally, the County’s reliance on North 93 Neighbors fails because existing zoning adjacent to the proposed rezone in that case allowed for commercial use as of right. North 93 Neighbors, ¶ 66. Here, as Plains Grains points out, SME’s proposed use would be allowed-if at all-only by the granting of a special use permit. The District Court applied the wrong test in rejecting the first prong of the Little spot zoning analysis. The District Court concluded that the requested use of the 668 acres for the proposed rezone would differ significantly from surrounding uses. SME does not challenge seriously this conclusion. Plains Grains has established the first prong of the Little test.
¶63 The second prong of the Little spot zoning test looks at whether *82 the size of the parcel to be rezoned would be “relatively small.” Consideration of the actual size of the parcel comprises only one element of this inquiry, but nonetheless constitutes a relevant factor. This Court determined in Greater Yellowstone Coalition, Inc. v. Bd. of Comm’rs, 2001 MT 99, 305 Mont. 232, 25 P.3d 168, that the County had engaged in impermissible spot zoning of a 323 acre parcel that comprised “a mere 2% of the District’s 13,280 acres.” Greater Yellowstone Coalition, ¶ 26. The 668 acres at issue in this case comprise a similarly small percentage of the land zoned for agriculture in Cascade County. The District Court acknowledged that Plains Grains “appears to have a compelling argument” with regard to the relatively small size of the area to be rezoned.
¶64 The number of landowners affected by the proposed rezone must be analyzed in concert with the third factor — whether the proposed zone change constitutes “special legislation.” North 93 Neighbors, ¶ 68 (citing Boland, 275 Mont. at 134, 910 P.2d at 894). The number of landowners affected relates directly to whether the zoning constitutes special legislation designed to benefit one person. North 93 Neighbors, ¶ 68. This inquiry should focus on the benefits of the proposed rezone to surrounding landowners, not the benefits-financial or otherwise-that would accrue from the proposed development. Boland, 275 Mont. at 134, 910 P.2d at 894. The Urquharts’ application for rezoning acknowledged that grain farming and cattle ranching constituted the predominant surrounding land uses. The Staff Report likewise confirms that agricultural production dominates the surrounding land uses.
¶65 The District Court found that “one landowner (be it viewed as either SME, the current deed holder, or the Urquharts, the applicants) will benefit at the expense of others.” The court recognized that these costs constituted “not merely the location of a power plant in the ‘Back 40’ but the power lines, rail spurs, and other industrial detritus of a large, power generating facility.” The court acknowledged that the impacts of this special legislation would be “imposed on some landowners by way of eminent domain.” We agree. No discernible benefit for the rezone would accrue to the neighboring farmers and ranchers. The benefits of the rezone inure solely to the owners of the 668 acres, first the Urquharts and now SME.
¶66 The District Court based its determination that no spot zoning had occurred on its conclusion that the zone change “was in name only” and did not change the uses allowed under the existing Cascade County regulations. Our application of the Little factors reveals, however, that the rezoning of the HGS property constituted spot *83 zoning. The requested heavy industrial use differs significantly from the current agricultural uses that dominate the surrounding area. The area to be rezoned is relatively small-both in absolute size and in terms of landowners affected. The proposed rezone smacks of “special legislation” in that the benefits would accrue to a single landowner to the detriment of the surrounding farmers and ranchers. Little, 193 Mont. at 346, 631 P.2d at 1289.
CONCLUSION
¶67 The County’s adoption of the 2009 amendments to the CCZR did not render moot Plains Grains’ spot zoning claim. The amendments did not change the rezoning at issue in this litigation. The 2009 amendments to the CCZR do not preclude us from granting Plains Grains the relief that it has requested. We deny SME’s motion to dismiss the appeal as moot based upon Plains Grains’ failure to challenge the 2009 amendments to the CCZR. The sale of the property from the Urquharts to SME likewise did not render moot Plains Grains’ claims.
¶68 We reverse the District Court’s order granting summary judgment to SME and grant judgment in favor of Plains Grains on its spot zoning claim. We also deny SME’s motion to dismiss the appeal as moot based on SME’s alleged expenditure of millions of dollars to prepare the 668 acres for a gas fired power plant.
¶69 We need not address Plains Grains’ remaining claims in light of our determination that the rezoning of the HGS property constituted impermissible spot zoning.
CHIEF JUSTICE McGRATH, JUSTICES LEAPHART and DISTRICT JUDGE SHERLOCK, sitting for JUSTICE WARNER concur. .